STATE OF NORTH CAROLINA v. TRACY THOMAS PECK

No. 12PA82

(Filed 2 June 1982)

**Searches and Seizures § 33— seizure of evidence from automobile passenger—
plain view rule not negated by officer's actions**

A highway patrolman lawfully seized a plastic bag containing MDA from
defendant's person under the "plain view" doctrine where the patrolman was
called to the scene at night to assist in the roadside arrest of the driver of a
car in which defendant was a passenger; in checking the stopped vehicle and
defendant, its passenger, the patrolman observed that defendant had red eyes,
dilated pupils and mucus on the corner of his mouth and that defendant ap-
peared cotton-mouthed; defendant told the patrolman that he felt sick; after
the patrolman asked defendant whether he had drugs on him or in the vehicle,
defendant leaned back and thrust his hand down into the front of his pants,
whereupon the patrolman instinctively grabbed defendant's hand and jerked it
out of his pants; the patrolman could then see the corner of the plastic bag
sticking out of defendant's pants where his hand had been and seized the bag;
and the patrolman did not know what the defendant was reaching for in his
pants, since the patrolman's reaction to defendant's furtive movement in seiz-
ing defendant's arm was reasonable as a self-protective measure, and the of-
ficer's conduct did not negate any of the four elements of the plain view doc-
trine.

Justice MITCHELL concurring.

Justice EXUM dissenting.

BY failure to timely file notice of appeal with this Court
within the time allowed by the Rules of Appellate Procedure,
defendant lost his right of appeal from a decision of a divided
panel of the Court of Appeals. 54 N.C. App. 302, 283 S.E. 2d 383
(1981). We allowed certiorari on 14 January 1982. The Court of
Appeals affirmed the judgment of *Lewis, J.* entered on 7 October
1980 in Superior Court, JACKSON County, upon defendant's plea of
guilty to possession of a Schedule I controlled substance following
denial of his motion to suppress evidence of a small plastic bag
containing a white powdery substance seized from defendant's
person. The item was seized by a highway patrolman who had
been called to the scene by a security guard on the Western
Carolina University campus to assist in the arrest of the driver of
the car in which defendant was a passenger. Upon defendant's
plea of guilty, he was sentenced to five years with execution
suspended for five years and defendant was placed on probation.

*Rufus L. Edmisten, Attorney General, by Guy A. Hamlin, Assistant Attorney General, for the State.*

*Thomas W. Jones, attorney for Defendant Appellant.*

MEYER, Justice.

The defendant Peck entered a plea of guilty to the charge of possession of a controlled substance but preserved his appeal from the denial of his motion to suppress the evidence of the seizure of the plastic bag from his person. G.S. § 15A-979(b) provides a right of appeal from a plea of guilty following denial of a motion to suppress. Defendant contends that the Court of Appeals erred in affirming the trial judge's denial of his motion to suppress because, he contends, the evidence reveals that the item sought to be suppressed was the fruit of an unlawful search and seizure. We cannot agree. We have carefully reviewed the opinion of the majority of the panel below and the briefs and authorities relating to defendant's contentions. We conclude that the result reached by the Court of Appeals, its reasoning, and the legal principles enunciated by it are correct, and we adopt that opinion as our own.

We find *Sibron v. New York*[1] cited in the dissent to be clearly distinguishable. Sibron was convicted of the unlawful possession of heroin. He moved before trial to suppress the heroin seized from his person by the arresting officer, Brooklyn Patrolman Anthony Martin. After the trial court denied his motion, Sibron pled guilty to the charge, preserving his right to appeal the evidentiary ruling. At the hearing on the motion to suppress, Officer Martin testified that while he was patrolling his beat in uniform on March 9, 1965, he observed Sibron "continually from the hours of 4:00 p.m. to 12:00, midnight . . . in the vicinity of 742 Broadway." He stated that during this period of time he saw Sibron in conversation with six or eight persons whom he (Patrolman Martin) knew from past experience to be narcotics addicts. The officer testified that he did not overhear any of these conversations, and that he did not see anything pass between Sibron and any of the others. Late in the evening Sibron entered a restaurant. Patrolman Martin saw Sibron speak with three

1. 392 U.S. 40, 20 L.Ed. 2d 917 (1968).

more known addicts inside the restaurant. Once again, nothing was overheard and nothing was seen to pass between Sibron and the addicts. Sibron sat down and ordered pie and coffee, and, as he was eating, Patrolman Martin approached him and told him to come outside. Once outside, the officer said to Sibron, "You know what I am after." According to the officer, Sibron "mumbled something and reached into his pocket." Simultaneously, Patrolman Martin thrust his hand into the same pocket, discovering several glassine envelopes, which, it turned out, contained heroin.

The prosecutor's theory at the hearing was that Patrolman Martin had probable cause to believe that Sibron was in possession of narcotics because he had seen him conversing with a number of known addicts over an eight-hour period. In the absence of any knowledge on Patrolman Martin's part concerning the nature of the intercourse between Sibron and the addicts, however, the trial court was inclined to grant the motion to suppress. As the judge stated, "All he knows about the unknown men: They are narcotics addicts. They might have been talking about the World Series. They might have been talking about prize fights." The prosecutor, however, reminded the judge that Sibron had admitted on the stand, in Patrolman Martin's absence, that he had been talking to the addicts about narcotics. Thereupon, the trial judge changed his mind and ruled that the officer had probable cause for an arrest.

Patrolman Martin did *not* urge that when Sibron put his hand in his pocket, he feared that he was going for a weapon and acted in self-defense.

In *Sibron* the District Attorney confessed error and although the Supreme Court acknowledges that "Confessions of error are, of course, entitled to and given great weight," it found that the confession of error did not relieve the Court of the performance of the judicial function and proceeded to decide the case on the merits. The Court, with regard to the confession of error said:

> The prosecution has quite properly abandoned the notion that there was probable cause to arrest Sibron for any crime at the time Patrolman Martin accosted him in the restaurant, took him outside and searched him. The officer was not acquainted with Sibron and had no information concerning him.

He merely saw Sibron talking to a number of known narcotics addicts over a period of eight hours. It must be emphasized that Patrolman Martin was completely ignorant regarding the content of these conversations, and that he saw nothing pass between Sibron and the addicts. So far as he knew, they might indeed 'have been talking about the World Series.' The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security.

392 U.S. at 62, 20 L.Ed. 2d at 934.

The Court concluded that Patrolman Martin's search of Sibron was unreasonable, that the evidence of the heroin seized was inadmissible, and, since the officer lacked probable cause for Sibron's arrest, the search could not be justified as incident to a lawful arrest.

In the case before us, the facts may be summarized as follows: On 23 March 1980, at approximately 8:00 p.m., Jess Shelton, a security officer at Western Carolina University, stopped a vehicle which he observed with tires squealing and dust flying. He stopped the vehicle to check the reason for the way it was being driven. He called North Carolina Highway Patrol Officer Cruzan for assistance because he (Shelton) was the only officer on duty at the time and he had orders not to leave the campus except in an emergency. By the time Patrolman Cruzan arrived, Officer Shelton had the driver of the vehicle, a Mr. Parker, in his vehicle. Upon arrival, Patrolman Cruzan asked Shelton if he had checked the passenger in the car. Upon being informed that he had not done so but that it looked like the passenger was intoxicated, Patrolman Cruzan approached the Parker vehicle and observed Mr. Peck inside the car on the passenger side. Officer Shelton testified that he went up to the Parker vehicle right behind Patrolman Cruzan, and that Patrolman Cruzan said to him, "Help me get him out of here." Officer Shelton testified that he (Shelton) thought that Peck had a gun although he did not see one. Officer Shelton further testified that he thought Peck had a gun when he (Shelton) got hold of him, and it was at that time that Patrolman Cruzan got a plastic bag from

Peck. Shelton did not hear all of the conversation between Patrolman Cruzan and Peck.

Patrolman Cruzan testified in effect that when he arrived Officer Shelton had the driver, Parker, under arrest for operating the vehicle without a license as his license had been previously revoked. Being informed that the passenger in the vehicle had not been checked, Patrolman Cruzan went to the passenger side of the Parker vehicle, opened the door, and started to talk to Peck who stated, "I'm feeling sick." Patrolman Cruzan told him to step out of the car if he was going to throw up, to which Peck replied, "I'm not going to throw up, I just don't feel good." Patrolman Cruzan then squatted down beside Peck. He observed the faint odor of an alcoholic beverage and saw that Peck's pupils were dilated, that his eyes were red, that his mouth had mucus on the corner of it and that he was "kind of cotton mouthed." Patrolman Cruzan said to Peck, "Son, do you have dope in here or on you?" At that time, Peck leaned back and stuck his left hand down in the front of his pants. When he did that Patrolman Cruzan grabbed his hand and jerked it out of his pants. For the first time, Cruzan could see in plain view the corner of a plastic bag sticking out of the defendant's pants where his hand had been. Patrolman Cruzan and Officer Shelton got Peck out of the vehicle. Cruzan held Peck's hands behind his back and reached around in front of Peck and pulled the plastic bag out of Peck's pants. The bag contained a white powdery substance later identified as the controlled substance methylenedioxyamphetamine (MDA). Officer Cruzan testified that he did not know when he saw Peck reach into his pants what was in his pants. He advised Peck of his constitutional rights and proceeded to search the rest of the vehicle. Cruzan testified on cross-examination, as narrated in the record before us, "that he had no reason to believe that the Defendant was going for a weapon."

There are certain similarities between this case and *Sibron*: (1) In both cases the defendant entered a plea of guilty but preserved his appeal on the denial of his motion to suppress the evidence of the drugs seized, (2) Highway Patrolman Cruzan's question to Peck as to whether he had any drugs is similar to Patrolman Martin's statement to Sibron that "You know what I am after," (3) drugs were taken from the person of both Peck and Sibron, and (4) at least ostensibly, neither officer's actions

resulted from a self-protective search for weapons. *Sibron* is otherwise completely dissimilar.

*Sibron* involved a situation in which the police officer without just cause accosted the defendant in a public restaurant and brought him outside onto the public street where the "search" was conducted for no other purpose than an attempt to find drugs. In the incident before us in this case there was a roadside arrest of the driver of a vehicle in the night-time. In checking the stopped vehicle and its passenger, Patrolman Cruzan observed that the passenger, defendant Peck, had red eyes, dilated pupils and mucus on the corner of his mouth; he appeared cotton-mouthed and said he felt sick. After Cruzan's investigatory question concerning whether Peck had drugs on him or in the vehicle, Peck leaned back and thrust his hand into his pants. In what appears to have been an instinctive reflex reaction, Cruzan grabbed his arm. Clearly, Patrolman Cruzan's reaction to Peck's furtive movement in seizing Peck's arm was reasonable as a self-protective measure.

We would no doubt have little difficulty in finding grounds for a protective search had Patrolman Cruzan been able to articulate for instance that there was a bulge in the defendant's pants or shirt which he believed to be a gun. Here the defendant's pants could certainly have concealed a knife, razor, or similar small but dangerous weapon. The point is, when a subject makes a furtive gesture or suspicious movement as here, the officer more often than not reacts instinctively to protect himself and others without reasoning as to whether there is an "articulable reason" or "founded suspicion." Perhaps the officer can articulate his reasons after the fact and upon reflection and perhaps he cannot. Perhaps he can later articulate nothing more than a common-sense instinct or conclusion about human behavior gained from experience. We must constantly remind ourselves that we examine the circumstances "after the fact" with much consideration and with hindsight in the calm and safety of a courtroom.

Crimes of violence are on the increase, and officers are becoming the victims of such crimes in increasing numbers. As a result the necessity for officers to protect themselves and others in situations where probable cause for an arrest

State v. Peck

may be lacking is now recognized and permitted. Of course, North Carolina has no 'stop and frisk' statute although many states do. See Raphael, 'Stop and Frisk' in a Nutshell: Some Last Editorial Thrusts and Parries Before It All Becomes History, 20 Ala. L. Rev. 294 (1968). The lack of such statute, however, is not fatal to the authority of law enforcement officers in North Carolina to stop suspicious persons for questioning (field interrogation) and to search those persons for dangerous weapons (frisking). These practices have been a time-honored police procedure and have been recognized as valid at common law 'as a reasonable and necessary police authority for the prevention of crime and the preservation of public order.' *People v. Rivera*, 14 N.Y. 2d 441, 252 N.Y.S. 2d 458, 201 N.E. 2d 32 (1964), and authorities cited. *See also, United States v. Vita*, 294 F. 2d 524 (2d cir. 1961); Cook, Detention and the Fourth Amendment, 23 Ala. L. Rev. 387 (1970-71); LaFave, 'Street Encounters' and the Constitution: Terry, Sibron, Peters and Beyond, 67 Mich. L. Rev. 40 (1968). Since the common law, unless abrogated or repealed by statute, is in full force and effect in this State, G.S. 4-1, the absence of statutory authority to stop and frisk does not render these common law practices illegal in our State.

Nor does the Federal Constitution prohibit them when they are reasonably employed. In *Terry v. Ohio*, 392 U.S. 1, 20 L.Ed. 2d 889, 88 S.Ct. 1868 (1968), the Court held, among other things, that 'the central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal liberty. * * * [W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.'

The Court then recognized that it is not always unreasonable to seize a person and subject him to a limited search for weapons where there is no probable cause for an arrest, stating: '[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such person in an attempt to discover weapons which might be used to assault him.' *Terry v. Ohio, supra.*

Thus, if the totality of circumstances affords an officer reasonable grounds to believe that criminal activity may be afoot, he may temporarily detain the suspect. If, after the detention, his personal observations confirm his apprehension that criminal activity may be afoot and indicate that the person may be armed, he may then frisk him as a matter of self-protection. *Terry v. Ohio, supra. See Adams v. Williams,* 407 U.S. 143, 32 L.Ed. 2d 612, 92 S.Ct. 1921 (1972).

*State v. Streeter,* 283 N.C. 203, 209-10, 195 S.E. 2d 502, 506-07 (1973).

It does not matter that subjectively Cruzan had no reason to believe that Peck had a gun. "[T]he scope of the Fourth Amendment is not determined by the subjective conclusion of the law enforcement officer." *United States v. Clark,* 559 F. 2d 420 (5th Cir. 1977), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed. 2d 457 (1977), *quoting United States v. Resnick,* 455 F. 2d 1127 (5th Cir. 1972). The officer's subjective opinion is not material. Nor are the courts bound by an officer's mistaken legal conclusion as to the existence or non-existence of probable cause or *reasonable* grounds for his actions. The search or seizure is valid when the objective facts known to the officer meet the standard required. *See Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed. 2d 168, *reh'g denied,* 438 U.S. 908, 98 S.Ct. 3127, 57 L.Ed. 2d 1150

(1978); *United States v. Bugarin-Casas*, 484 F. 2d 853 (9th Cir. 1973), *cert. denied*, 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed. 2d 762 (1974); *Klingler v. United States*, 409 F. 2d 299 (8th Cir. 1969), *cert. denied*, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed. 2d 110 (1969); *State v. Vaughn*, 12 Ariz. App. 442, 471 P. 2d 744 (1970); *People v. Baird*, 172 Colo. 112, 470 P. 2d 20 (1970), *citing Sirimarco v. United States*, 315 F. 2d 699 (10th Cir. 1963), *cert. denied*, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed. 2d 1032 (1963); *State v. Vanzant*, 14 Wash. App. 679, 544 P. 2d 786 (1975). *See generally* 1 W. LaFave, Search and Seizure, A Treatise on the Fourth Amendment §§ 1.2(g), 3.2(b) (1978).

Cruzan testified that he did not know what Peck was reaching for in his pants. The test of "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger" is clearly met on the facts before us. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed. 2d 889, 909 (1968). We are here concerned with whether the conduct of Officer Cruzan negated any of the four elements of the plain view doctrine upon which this case was determined by the trial court and the Court of Appeals. We agree with the Court of Appeals that the four elements of the plain view doctrine as enunciated by the Supreme Court in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed. 2d 564 (1971), were present. First, Patrolman Cruzan had legal justification to be at the place and in the position he was when he saw the evidence in plain view. Second, the discovery of the evidence was inadvertent as it was discovered incident to removal of the defendant's hand from his pants and clearly was not the result of a deliberate search. Third, the evidence was immediately apparent and its discovery under the circumstances clearly would warrant a man of reasonable caution in believing that the defendant was in the possession of drugs and was hiding evidence which would incriminate him. Fourth, Patrolman Cruzan's observation of the defendant's condition and the sight of part of the plastic bag which contained the white powdery substance was such as to give a reasonable man the belief that there was evidence of criminal activity present, to-wit, the possession of drugs.

The Court of Appeals affirmed the defendant's conviction and held that the trial court correctly denied defendant's motion to

suppress, reasoning that the plain view doctrine was applicable and all elements were present. We agree.

The decision of the Court of Appeals is

Affirmed.

Justice MITCHELL concurring.

I completely concur in both the reasoning and the result reached by the majority. I would, however, rest this Court's action in affirming the Court of Appeals upon an additional basis.

This case presents a situation in which certain facts are undisputed. A law enforcement officer, acting upon probable cause, stopped the vehicle in which the defendant was a passenger. After stopping the vehicle, the officer lawfully took the driver into custody and placed him in a law enforcement vehicle. Patrolman Cruzan, who was assisting the arresting officer, approached the defendant who had remained seated in the automobile. When the defendant thrust his hand inside the front of his pants in the manner described in the majority opinion, Patrolman Cruzan found the plastic bag on the defendant's person.

I am of the opinion that the Supreme Court of the United States has clearly indicated that *Sibron v. New York*, 392 U.S. 40, 20 L.Ed. 2d 917, 88 S.Ct. 1889 (1968) is not controlling authority in cases involving searches of the occupants of automobiles. In *New York v. Belton*, 453 U.S. 454, 69 L.Ed. 2d 768, 101 S.Ct. 2860 (1981), the Supreme Court clearly indicated that a police officer who has effected a lawful custodial arrest of a driver of a vehicle may, contemporaneous with that arrest, conduct a search of the passenger compartment of the vehicle extending to the contents of containers found therein. I believe the Supreme Court wisely attempted to establish a brightline rule which could be followed by law enforcement officers without the necessity of having police attorneys or constitutional scholars present to assist them in the search. Under the authority of *Belton*, Patrolman Cruzan clearly could have conducted a thorough search of any containers or clothing located in the passenger compartment of the automobile *including those belonging to passengers* such as the defendant. To

hold that *Belton* would not also authorize at least a "frisk" or "pat down" of a passenger in the same automobile would seem to me to create an anomaly in the law of search and seizure and draw the sort of fine distinction far more useful to students in a classroom than to law enforcement officers conducting searches of automobiles on our public streets at night. I do not find *Sibron* controlling or even very relevant to the decision of the case at hand.

In *United States v. DiRe*, 332 U.S. 581, 92 L.Ed. 210, 68 S.Ct. 222 (1948) the Supreme Court indicated that authority to conduct a warrantless search of an automobile does not automatically give rise to authority to search an occupant of the automobile. I do not believe, however, that *DiRe* should be considered controlling in the present case. It is important to note that *DiRe* involved a full search and was decided well before the "stop and frisk" principle of *Terry v. Ohio*, 392 U.S. 1, 20 L.Ed. 2d 889, 88 S.Ct. 1868 (1968) and the "search of the area within an arrestee's immediate control" doctrine of *Chimel v. California*, 395 U.S. 752, 23 L.Ed. 2d 685, 89 S.Ct. 2034 (1969) were enunciated by the Supreme Court. In my view, the principles articulated in *Terry* and *Chimel* now converge with the holding in *Belton* to require a second brightline rule authorizing law enforcement officers to "pat down" or "frisk" the passengers in an automobile[1] when they have lawfully stopped the automobile and lawfully arrested the driver. *United States v. Wiga*, 662 F. 2d 1325 (9th Cir. 1981); *United States v. Poms*, 484 F. 2d 919 (4th Cir. 1973) (per curiam); *United States v. Berryhill*, 445 F. 2d 1189 (9th Cir. 1971); *see also Ybarra v. Illinois*, 444 U.S. 85, 98, 62 L.Ed. 2d 238, 250, 100 S.Ct. 338, 346 (1979) (Rehnquist, J., dissenting). *Contra United States v. Simmons*, 567 F. 2d 314 (7th Cir. 1977).

Further, this authority to "pat down" or "frisk" the passengers is not, in my view, based upon a requirement that the law enforcement officer involved have a belief, reasonable or otherwise, that the passenger is armed or possesses contraband. Instead, I believe that we can and should legitimately take judicial notice in fashioning such a rule that there is a substantial potential threat to the lives of our law enforcement officers by passengers of automobiles in all cases in which officers are re-

---

1. The case before us does not involve a common carrier.

quired in the exercise of their duties to stop such automobiles and arrest the drivers. For me, a proper balancing of the competing interests to be considered in Fourth Amendment analysis compels the conclusion that a "pat down" or "frisk" is a justifiable and reasonable intrusion into the privacy of a passenger in an automobile under such circumstances. More particularly under the facts of the present case, Patrolman Cruzan, being possessed of the authority to "pat down" or "frisk" a passenger such as the defendant, was certainly within his authority to grab the defendant's wrist and hand and pull them from inside the front of the defendant's pants where the defendant had thrust them while Cruzan was questioning him.

I believe that a brightline rule such as I have outlined is absolutely required lest we encourage our law enforcement officers to ignore the law of search and seizure or unnecessarily endanger their lives in cases such as this. I strongly fear that their healthy instincts for survival will require them to adopt one approach or the other in similar cases if we fail to adopt such a rule.

It is appropriate here to point out that the officers of our North Carolina Highway Patrol do not ordinarily have the assistance of other officers immediately available as did Patrolman Cruzan in the present case. Instead, these patrolmen almost always perform their duties alone, frequently in the more remote areas of our large and primarily rural State. When they are required in the performance of their lawful duties to stop automobiles, it is more often than not the case that no other law enforcement officers are close enough to them to render assistance in any reasonable period of time. Although I recognize that these facts are not compelling when establishing a general rule of law, they are the facts with which these officers are required to live every day and night of the year.

As one court has correctly observed, "It is inconceivable that a peace officer effecting a lawful arrest of an occupant of a vehicle must expose himself to a shot in the back from defendant's associate because he cannot, on the spot, make the nice distinction between whether the other is a companion in crime or a social acquaintance." *United States v. Berryhill,* 445 F. 2d at 1193.

I would affirm the opinion of the Court of Appeals finding no error in the trial of the defendant on the basis of the rule I have

outlined previously herein as well as for the reasons set forth by the majority.

Justice EXUM dissenting.

Try as I might, I am simply unable to concur in the majority's attempt to distinguish *Sibron v. New York*, 392 U.S. 40 (1968). The majority recognizes that Patrolman Cruzan had no subjective belief that a protective search of defendant was necessary. The majority states, however, that "[t]he officer's subjective opinion is not material. . . . The search or seizure is valid when the objective facts known to the officer meet the standard required." None of the cases it cites for this proposition deal with the *Terry*-type situation in which the officer is conducting a limited frisk to protect himself or others. These cases deal generally with situations where (1) an officer was of the opinion that no probable cause existed when, in law, there was probable cause; (2) an officer's action was supportable on a legal theory different from that proffered by him; or (3) there was no probable cause at the time the officer determined to act, but thereafter and before the officer's action probable cause developed. Thus these cases stand for the proposition that the court will not be bound by an officer's erroneous legal theory when other legal theories will support his actions.

Here Officer Cruzan declared, not as a matter of law, but as a matter of fact, that he had "no reason to believe that Defendant was going for a weapon." The Court is bound by this declaration of the officer's best professional *factual* determination. It may not go behind this determination to justify Officer Cruzan's actions on the basis of what, upon the objective, articulable circumstances, he, or some other reasonable officer, *might* have thought. The requirement of objective, articulable circumstances in a *Terry*-type, protective seizure is designed to be a limitation on, not a substitute for, the officer's subjective determination of what the circumstances required. The Court should thus rely on the professional expertise of the individual officer and allow him to make the initial determination of the necessity for a protective frisk. It should then *review* his action, in light of the objective facts and constitutional standards.

Because of the similarity of objective facts and the constitutional question involved in *Sibron* to the instant case, I believe

*Sibron* controls this case. Therefore, Patrolman Cruzan's grabbing defendant's hand and jerking it out of his pants, under circumstances which gave Cruzan "no reason to believe that the Defendant was going for a weapon," constituted an illegal seizure. The illegal seizure caused the packet containing the MDA to come into Cruzan's view. Thus the first requisite for application of the plain view doctrine, *i.e.*, that the officer was in a legally justifiable position when he observed the drugs, was not met. *See Coolidge v. New Hampshire,* 403 U.S. 443 (1971).

Chief Justice BRANCH and Justice CARLTON join in this dissenting opinion.