STATE OF NORTH CAROLINA v. KENNETH BARNARD

No. COA06-209

(Filed 19 June 2007)

**1. Search and Seizure— traffic stop—thirty-second delay at stop light—reasonable articulable suspicion**

The trial court did not err by ruling that an officer had an objectively reasonable articulable suspicion that defendant might be impaired and properly stopped defendant's vehicle after defendant hesitated for thirty seconds after a stop light turned green. Thirty seconds goes well beyond the delay caused by routine distractions.

STATE v. BARNARD

[184 N.C. App. 25 (2007)]

**2. Evidence— testimony stricken and curative instruction given—any error in allowing testimony cured**

Granting defendant's motion to strike and giving a prompt curative instruction cured any error in denying defendant's motion to suppress his response to an officer's question about how long he had had a habit.

**3. Confessions and Incriminating Statements— voluntary statements—Miranda not applicable**

Defendant's motion to suppress statements he had made to an officer was properly denied where he had volunteered those statements. Miranda does not apply to voluntary statements made without questioning.

**4. Appeal and Error— preservation of issues—contention not raised below—not briefed—not considered**

Defendant's argument concerning a search of his person was not considered where he did not raise it to the trial court and did not specifically argue it in his brief on appeal.

Judge CALABRIA dissenting.

Appeal by defendant from judgment entered 6 April 2005 by Judge James U. Downs in Buncombe County Superior Court. Heard in the Court of Appeals 30 October 2006.

*Roy Cooper, Attorney General, by Daniel S. Johnson, Special Deputy Attorney General, for the State.*

*Anne Bleyman for defendant-appellant.*

MARTIN, Chief Judge.

Defendant was charged in bills of indictment with two counts of possession of cocaine and two counts of having achieved the status of an habitual felon. Prior to trial, defendant moved to suppress evidence seized as a result of searches of his vehicle and his person, as well as statements which he made to the police. After a hearing, the motion to suppress was denied. Defendant was convicted by a jury of two counts of possession of cocaine and subsequently entered a plea of guilty to one count of having achieved the status of an habitual felon. The remaining habitual felon charge was dismissed. He appeals from a judgment sentencing him to a minimum term of 168 months and a maximum term of 211 months imprisonment. We find no error.

**STATE v. BARNARD**

[184 N.C. App. 25 (2007)]

The evidence presented at the suppression hearing and at trial tended to show that at around 12:15 a.m. on 2 December 2004, Officer Brett Maltby was on patrol in a high crime area of downtown Asheville where a number of bars are located. Officer Maltby was driving a marked patrol car and was behind defendant's vehicle, a 1993 Ford Taurus, which was stopped at a red traffic light. When the light turned green, defendant remained stopped for approximately thirty seconds before making a left turn. Based upon his training and experience, Officer Maltby considered that the delayed reaction to the green light was an indicator that the driver of the vehicle may be impaired. Officer Maltby initiated a stop of the vehicle to determine whether, in fact, the driver was impaired.

Officer Maltby approached defendant and asked for his license and registration. Defendant's breathing was rapid and he was shaking. Officer Maltby smelled a slight odor of alcohol on defendant's breath. Defendant said that he did not have his license and gave Officer Maltby a name and birth date. Officer Maltby returned to his patrol car to conduct a check of the name and birth date to determine if defendant had a driver's license and to check for outstanding warrants. He determined that the information which the defendant had given him was not correct. Officer Maltby then returned to defendant's vehicle and asked him to step out of his vehicle. Officer Maltby observed an open container of alcohol partially concealed in a paper bag. Officer Maltby placed defendant in investigatory detention, handcuffed him due to his nervousness and inability to explain his identity, and walked him back to the patrol car. Defendant then disclosed his real name, and Officer Maltby was able to determine that his driver's license had been suspended. Officer Maltby began to write a citation for possession of an open container of alcohol and driving while license revoked.

Officer Dwight Arrowood arrived at the scene to assist Officer Maltby. At Officer Maltby's direction, Officer Arrowood searched the interior of the Taurus and recovered a crack pipe and a Brillo pad, which is sometimes used as a filter for a crack pipe. Officer Maltby then began to write a citation for possession of drug paraphernalia when defendant said he would do anything to get out of the situation and offered to purchase narcotics. He told Officer Maltby that he had purchased crack cocaine earlier that day from a person known as "One-Arm Willy." Maltby was familiar with "One-Arm Willy" and agreed to void the citations he was writing if defendant would make a controlled buy from his drug dealer.

Officer Maltby stored defendant's vehicle, took him to the police station, and secured the assistance of an undercover narcotics officer, Officer Lauffer. Defendant agreed to go to the residence of One-Arm Willy and purchase a $20 rock of crack cocaine. The officers explained that defendant would be searched prior to leaving the police station, that he would accompany Officer Lauffer to the residence, purchase the crack cocaine and return immediately to the officer's car. He would then be returned to the police station where he would be debriefed and searched a second time.

Defendant successfully purchased a crack rock from the dealer and turned it over to Officer Lauffer, who gave it to Officer Maltby when they returned to the police station. Officer Maltby then began to debrief defendant, inquiring as to what he had seen in the house for the purpose of obtaining and executing a search warrant. Officer Maltby searched defendant and found a small rock of crack cocaine concealed in defendant's pocket. Defendant told Officer Maltby that he had gotten a "front" from One-Arm Willy for the second rock of cocaine. He then "asked [Officer Maltby] if he could just have the rock of crack cocaine back." Officer Maltby refused and concluded that the defendant was not sufficiently reliable to be used as a confidential informant to support a search warrant of the dealer's home. Officer Maltby took defendant home and subsequently charged him with possession of crack cocaine.

---

On appeal, defendant contends the trial court erred in denying his motion to suppress the evidence seized by the officers as a result of the vehicle stop and subsequent search of his vehicle, as well as statements which he made to Officer Maltby. We have carefully considered his arguments and conclude the evidence was properly admitted.

On a motion to suppress, we review a trial court's findings of fact to determine if there is competent evidence to support them. *State v. Brewington*, 170 N.C. App. 264, 271, 612 S.E.2d 648, 653 (2005) (citation omitted). The trial court's findings upon conflicting evidence are accorded "great deference upon appellate review as it has the duty to hear testimony and weigh the evidence." *Id.* If the findings are supported by competent evidence, they are conclusive on appeal. *State v. Campbell*, 359 N.C. 644, 661, 617 S.E.2d 1, 12 (2005). The conclusions of law which the court draws from those findings are fully reviewable. *Id.* at 662, 617 S.E.2d at 13.

STATE v. BARNARD

[184 N.C. App. 25 (2007)]

**[1]** Defendant first challenges the trial court's denial of his motion to suppress the evidence related to Officer Maltby's traffic stop of the defendant's vehicle. He argues that Officer Maltby had neither probable cause nor a reasonable, articulable suspicion to stop defendant and therefore it was error to admit evidence resulting from the stop. We disagree.

A police officer may effect a brief investigatory seizure of an individual where the officer has reasonable, articulable suspicion that a crime may be underway. *Terry v. Ohio*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906 (1968). "Reasonable suspicion" requires that "[t]he stop . . . be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training." *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994). All the State is required to show is a "minimal level of objective justification, something more than an 'unparticularized suspicion or hunch.'" *Id.* at 442, 446 S.E.2d at 70 (quoting *U.S. v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 10 (1989)). A court must consider the totality of the circumstances in determining whether the officer possessed a reasonable and articulable suspicion to make an investigatory stop. *Id.* at 441, 446 S.E.2d at 70.

The trial court found that on 2 December 2004, defendant stopped at an intersection and "remained stopped for some 30 seconds without any reasonable appearance of explanation for doing so." This finding is amply supported by competent evidence and thus binding on appeal. *See State v. Parker*, 137 N.C. App. 590, 598, 530 S.E.2d 297, 302 (2000). Based on this finding, the trial court concluded the following:

> [T]he Court concludes that from the totality of the circumstances that [sic] a reasonable articulable suspicion of wrongdoing on the part of the Defendant existed to warrant Officer Maltby's stop of the Defendant's vehicle in view of its prolonged existence at this intersection without any reason for doing so.

When considering the totality of the circumstances, the trial court's findings provide the requisite objective justification from which a conclusion can be drawn that a reasonable suspicion existed to warrant Officer Maltby's stop. From defendant's thirty second delay, Officer Maltby made a rational inference that defendant might be impaired. This inference was based on Officer Maltby's training and experience, as reflected by his testimony.

Q: Based upon your training and experience, do you have an opinion as to whether or not that sort of delayed reaction could usually involve an impaired substance or driving while impaired?

A: Absolutely. Yes, sir.

Q: Can you articulate that?

A: People's reaction is slowed down. A red light turning green and hesitating for 30 seconds definitely would be an indicator of impairment.

Defendant, however, cites *State v. Roberson*, 163 N.C. App. 129, 135, 592 S.E.2d 733, 737 (2004), in which this Court held that a driver's eight to ten second delayed reaction at a traffic light did not give the officer a reasonable and articulable suspicion of criminal activity. This Court predicated its holding on the multitude of reasons a motorist's attention may be diverted for such a quick span of time. *Id.* at 134, 592 S.E.2d at 737. The instant case is distinguishable in that the length of defendant's delay at the traffic light, at thirty seconds, was three times longer than the delay in *Roberson*. A thirty second delay goes well beyond the delay caused by a motorist's routine distractions, such as changing a radio station, glancing at a map or looking in the rear view mirror. *See People v. Kelly*, 802 N.E.2d 850, 853 (Ill. Ct. App. 2003) (finding a twenty second delay at a traffic light to be an unreasonable period of time to react to the stop light change and to ascertain it to be safe to proceed). As a result, Officer Maltby was confronted with a far greater likelihood that the driver might be impaired.

The trial court did not err in ruling that Officer Maltby had an objectively reasonable articulable suspicion that defendant may be impaired and properly performed a *Terry* stop of defendant's vehicle. Therefore, the evidence seized as a result of the stop was properly admitted.

**[2]** Defendant next argues that the trial court erred in denying his motion to suppress any statements he made after he was handcuffed and placed in the patrol car because Officer Maltby failed to properly advise him of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). " 'It is well established that *Miranda* warnings are required only when a [criminal] defendant is subjected to custodial interrogation.' " *State v. Smith*, 160 N.C. App. 107, 114, 584 S.E.2d 830, 835 (2003) (quoting *State v. Patterson*, 146 N.C. App. 113, 121, 552 S.E.2d 246, 253 (2001)). The United States

Supreme Court has defined "interrogation" as "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect[.]" *Rhode Island v. Innis*, 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308 (1980). "Volunteered statements of any kind are not barred by the Fifth Amendment[.]" *Miranda*, 384 U.S. at 478, 16 L. Ed. 2d at 726.

During the trial, the prosecutor asked Officer Maltby about events which occurred after he had placed defendant in his patrol car:

Q: Did you then proceed to write the Defendant a citation for Possession of Drug Paraphernalia?

A: Yes, I did.

Q: Okay. And did the Defendant say anything to you in response to your writing those citations?

Defense Counsel: Objection, Your Honor, prior motion.

The Court: Overruled.

A: I asked the Defendant how long he had had a habit. At that point the defendant stated for a number of years. He said he just recently started back with his habit because of recent legal problems and troubles.

Defense Counsel: Objection, move to strike, Your Honor.

The Court: The motion is allowed. Members of the jury, do not consider that last response of the witness.

Our Supreme Court has held "where the trial court immediately sustains the defendant's objection to a prosecutor's comment and instructs the jury to disregard the offending remark, the impropriety is cured." *State v. Garner*, 340 N.C. 573, 593, 459 S.E.2d 718, 728 (1995) (citing *State v. Maynor*, 331 N.C. 695, 417 S.E.2d 453 (1992); *State v. Small*, 328 N.C. 175, 400 S.E.2d 413 (1991)). Assuming, *arguendo*, that it was error for the trial court to deny defendant's motion to suppress defendant's response to this particular question, any error was cured by the trial court's grant of defendant's motion to strike and prompt instruction to the jury not to consider the statement.

**[3]** As for defendant's statements regarding his willingness to participate in the controlled buy, the trial court found that those statements were made "without any questions being asked." Officer Maltby's direct examination continued:

Q: Officer Maltby, did the Defendant at some time initiate a conversation with you, not in response to any question that you might have asked—

Defense Counsel: Objection, leading, Your Honor.

The Court: Overruled.

Q: —not in response to any question you may have asked him, regarding the charges that you were writing?

A: Yes. He advised there's no way that he could hold another charge, to be charged with something of this magnitude, and advised that he would do anything and everything to try to help himself out in this matter.

Defense Counsel: Objection. Move to strike.

The Court: The motion is denied. The objection is overruled.

Q: What did he say with regards to what he could do to help?

A: He said he knew several different locations where he could go back and purchase narcotics. He advised one location through a gentleman in West Asheville on 70 Howard Street by the name of—nickname of One-Arm Willy.

Q: And did he say that he had been to One-Arm Willy's recently?

A: He did. He said he had recently purchased crack at One-Arm Willy's house as recently as that day.

Q: I'm going to ask you to try to raise your voice just a little bit.

A: I'm sorry. Repeat. He did advise that he had been to One-Arm Willy's house and had been there as recently as that day to purchase crack.

Q: Did he indicate whether or not he had smoked that crack?

A: Yes, he did.

Q: And what else did he say about One-Arm Willy in connection with his pleading with you to help out with the charges?

A: He advised again that he would do absolutely anything to help himself out to—to get rid of these charges that I had on him during this vehicle stop.

Officer Maltby testified that defendant volunteered the statements spontaneously without prompting or questioning. The trial court concluded that these statements were "voluntarily made, not as a result of any questions being asked of [defendant]." The trial court's conclusion is supported by the findings of fact. The holding in *Miranda* does not apply to voluntary statements and, therefore, the motion to suppress the statements was properly denied. *See Miranda*, 384 U.S. at 478, 16 L. Ed. 2d at 726.

[4] Finally, though defendant has assigned error to the admission of evidence regarding Officer Maltby's search of his person after defendant returned from the controlled buy, he has not specifically argued it in his brief and the assignment of error could be taken as abandoned. N.C. R. App. P. 28(b)(6) (2006). In any event, the defendant did not raise the issue of the search of his person in his argument to the trial court and we will not consider it on appeal. N.C. R. App. P. 10(b)(1); *see State v. Valentine*, 357 N.C. 512, 525, 591 S.E.2d 846, 857 (2003).

No error.

Judge TYSON concurs.

Judge CALABRIA dissents with a separate opinion.

CALABRIA, Judge, dissenting.

I respectfully dissent from the majority opinion that there was no error in the court's denial of defendant's motion to suppress evidence. A 30-second delay at a green light fails to provide the particularized suspicion required for an investigative stop, and I would therefore hold that the trial court erred in denying defendant's motion to suppress the crack discovered during the stop and the statements made following the stop. However, I would remand the case to the trial court for further proceedings to determine whether the crack rock seized from defendant following his participation in a controlled buy is fruit of the poisonous tree and should therefore be suppressed.

In the instant case, defendant contends that Officer Maltby, an officer with the Asheville Police Department, had no reasonable, articulable suspicion to stop him and it was therefore error for the court to deny defendant's motion to suppress evidence resulting from the stop. "On a motion to suppress evidence, the trial court's findings of fact are conclusive on appeal if supported by competent evidence."

*State v. Campbell*, 359 N.C. 644, 661, 617 S.E.2d 1, 12 (2005), *pet. denied, Campbell v. N.C.*, 126 S. Ct. 1773, 164 L. Ed. 2d 523 (2006). However, the conclusions of law supported by those findings are reviewed *de novo. Id.* at 662, 617 S.E.2d at 13.

As the majority correctly notes, a police officer may affect a brief investigatory seizure of an individual where the officer has reasonable, articulable suspicion that a crime may be underway. *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889 (1968). To justify what is known as a *Terry* stop, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. This rule also applies to investigatory traffic stops where the officer does not have probable cause to stop the vehicle. "[A]n investigatory-type traffic stop is justified if the totality of [the] circumstances affords an officer reasonable grounds to believe that criminal activity may be afoot." *State v. Wilson*, 155 N.C. App. 89, 95, 574 S.E.2d 93, 98 (2002). Something more than an "unparticularized suspicion or 'hunch' " is required. *U.S. v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 1, 10 (1989).

In the case *sub judice*, Officer Maltby testified that he stopped defendant because defendant hesitated for approximately 30 seconds before proceeding through the intersection after the red light had turned green. Officer Maltby stated that he considered the defendant's delay in proceeding through the light to be indicative of a slowed reaction time, which he believed indicated impairment. Defendant presents plausible alternative reasons why a driver might hesitate before proceeding through an intersection after a red light has turned green. Defendant argues that a 30-second delay, by itself, provides insufficient grounds to justify a *Terry* stop. I agree.

As the majority notes, this Court has previously considered the question of whether a slight delay in proceeding through a green light provides a sufficient basis to conduct a stop of a defendant's vehicle. In *State v. Roberson*, we determined it was not error for a trial court to grant a motion to suppress where the only reason a police officer stopped a driver was based on an 8 to 10 second delay before responding to a traffic light changing from red to green. 163 N.C. App. 129, 592 S.E.2d 733 (2004).

The *Roberson* case was a case of first impression in North Carolina. In *Roberson*, this Court noted that a driver's actions must be evaluated against the "backdrop of everyday driving experience" and stated that "[i]t is self-evident that motorists often pause at a

stop sign or traffic light when their attention is distracted or preoccupied by outside influences." *Id.* at 134, 592 S.E.2d at 736 (quoting *State v. Emory,* 809 P.2d 522, 525 (Idaho Sup. Ct. 1991)). The Court further stated:

> A motorist waiting at a traffic light can have her attention diverted for any number of reasons. . . . *When defendant did cross the intersection, there was nothing suspicious about her driving and thus no indication that she may have been under the influence of alcohol. Consequently, defendant's driving, including the delayed reaction at the traffic light, did not give rise to a reasonable, articulable suspicion that she was driving while under the influence.*

*Roberson,* 163 N.C. App. at 134-35, 592 S.E.2d at 737 (emphasis supplied).

The rule stated in *Roberson* is applicable here since the defendant's delay in the face of a changing traffic light formed the sole basis of Officer Maltby's suspicion that defendant was engaged in or was about to be engaged in criminal activity.

The case *sub judice* involves a delay of approximately 30 seconds, 20 seconds longer than the stop in *Roberson.* However, the instant case is similar to *Roberson* in that the delay could be attributable to impairment but it could also be attributable to numerous other causes and there was nothing else suspicious about defendant's driving.

While testifying on direct examination, Officer Maltby stated that he believed defendant's attention was diverted by the presence of a police cruiser pulling in behind him. The relevant exchange in the record is as follows:

> Officer Maltby: The traffic light turned green for northbound direction of travel. I observed the Defendant's car stopped at this red light for approximately 30 seconds before it finally made a left-hand turn onto Hilliard Avenue.
>
> Prosecutor: Did you find that to be unusual?
>
> Officer Maltby: Yes sir, I did.
>
> Prosecutor: Why is that unusual?
>
> Officer Maltby: Typically it would mean, I believe, that the Defendant was paying particular attention to the rear view mirror and noticing me and not the actual traffic light.

As Officer Maltby himself recognized, it is typical for a driver to watch the rear view mirror when a patrol car pulls in behind him, and this fact explains why a driver's attention was diverted from the traffic light changing from red to green. Officer Maltby testified that he did not look at his watch to determine the exact amount of time defendant delayed making his turn, but merely estimated that approximately 30 seconds elapsed while the light changed from red to green. Officer Maltby also stated that the light remained green as defendant made his lawful left-hand turn and noticed nothing suspicious in defendant's driving.

Officer Maltby's testimony indicates that he did not believe he had ample reason to stop defendant based on the delay alone, but decided to further observe defendant's driving for signs of impairment. On cross-examination, Officer Maltby was asked why he did not honk or beep his horn to get the defendant's attention. The officer responded: "I wanted to further my investigation and watch him in his driving demeanor at that point." When Officer Maltby was asked about defendant's driving demeanor, he responded that the left turn defendant made was a legal left turn. Officer Maltby further stated that he previously observed defendant's driving for approximately two minutes prior to stopping him at the red light. Just as there was nothing suspicious about defendant's driving after the light turned green and he turned left, there was also nothing suspicious about defendant's driving during the two minutes prior to his stop at the red light. Thus, Officer Maltby's suspicion was a vague, unparticularized suspicion, which under *Terry* and its progeny, does not justify a stop. Further, neither the location of the stop nor the time bolster the officer's unparticularized suspicion.

> The fact that Officer Eaton's observation of defendant gave rise to no more than an " 'unparticularized suspicion or hunch,' " *Steen*, 352 N.C. at 239, 536 S.E.2d at 8 (citation omitted), cannot be rehabilitated by adding to the mix of considerations the general statistics advocated by the State on time, location, and special events from which a law enforcement officer would draw his inferences based on his training and experience, see, e.g., *Emory*, 119 Idaho at 664, 809 P.2d at 525 ("[statistical] inferences must still be evaluated against the backdrop of everyday driving experience . . . [and the time of day of the stop] does not enhance the suspicious nature of the observation [of the delay]").

*Roberson*, 163 N.C. App. at 134-35, 592 S.E.2d at 737 (citations omitted).

Although the majority notes that Officer Maltby initiated the stop in a "high-crime area," it does not include this factor in weighing the totality of the circumstances which must be considered in evaluating the legality of the stop. Officer Maltby testified that the area in question has a specific reputation for drug activity, prostitution, breaking and entering, and possession of stolen vehicles, not that the area is notorious for impaired driving.

A neighborhood's general reputation for drug activity is not enough to support a specific suspicion that a defendant is driving while intoxicated. Otherwise, police would be justified in stopping any motorist driving through a bad neighborhood where the motorist hesitates at a stop light or other traffic control device, and this justification would come largely from external factors nonspecific to the driver of the automobile.

We have previously determined that an officer's decision to stop a vehicle based on reasonable suspicion is justified only if the totality of circumstances affords an officer reasonable grounds to believe that criminal activity may be afoot. *State v. Peck*, 305 N.C. 734, 741, 291 S.E.2d 637, 641 (1982). For instance, an officer had reasonable suspicion to stop a vehicle when he observed a driver who the officer believed was driving with a revoked license. *State v. Kincaid*, 147 N.C. App. 94, 555 S.E.2d 294 (2001). Similarly, we have held that an officer may conduct an investigatory stop of a vehicle where he reasonably suspects the vehicle's windows may be tinted more darkly than allowed by North Carolina law. *State v. Schiffer*, 132 N.C. App. 22, 510 S.E.2d 165 (1999).

However, in this case, Officer Maltby observed nothing suspicious about defendant's driving except for a pause in the face of a traffic light turning green. As we noted in *Roberson*, such a delay could be caused by any number of factors common in everyday driving. A motorist hesitating at a light could be distracted by things such as changing a radio station or glancing at a map, as the majority recognizes, or even glancing in the rear view mirror at a patrol car, as Officer Maltby himself recognized. But despite the majority's assertion to the contrary, such factors may cause a motorist to hesitate longer than 10 seconds after a light has changed. As such, the justifications cited in *Roberson* are not erased by the passage of an additional 20 seconds.

The majority cites *People v. Kelly*, 802 N.E.2d 850 (Ill. Ct. App. 2003), for the proposition that a 20-second delay at a traffic light is an unreasonable period of time to react to the stop light change and to ascertain it to be safe to proceed. In *Kelly*, the Illinois Court of Appeals affirmed a trial judge who also denied defendant's motion to suppress evidence. The trial court's denial was based on the officer's reasonable grounds to stop a defendant who paused for 20 seconds after a red light changed to green. However, the Illinois trial court based its decision on defendant's violation of Illinois statutes requiring drivers to obey traffic control devices. That is, the defendant's delay at the light changing from red to green provided grounds for the officer to stop him *based on his violation of specific statutes* that prohibited stopping, standing, or parking in specific places. The court *did not* determine that the 20-second delay provided reasonable grounds to believe that defendant was impaired. Here, since no such statute is implicated, *Kelly* is wholly inapplicable to this case.

In fact, Illinois has another case which is instructive to the case *sub judice*. In *People v. Dionesotes*, 603 N.E.2d 118 (Ill. Ct. App. 1992), the Illinois Court of Appeals held that there was no reasonable, articulable suspicion for an officer to stop a driver who at 2:30 a.m. was observed driving 10 miles per hour in a 25 mile per hour zone and who subsequently stopped his car for approximately one-and-a-half minutes before resuming his driving. The *Kelly* court stated that under the facts in *Dionesotes*, it would have been objectively reasonable for an officer to suspect impairment. *Id.* at 856. However, this is a misreading of the *Dionesotes* decision. In *Dionesotes*, the court stated:

> In the present case, defendant drove slowly and stopped his car in the middle of the street for a short period of time. These facts do not support a reasonable inference that defendant is committing, is about to commit, or has committed an offense.

*Dionesotes*, 603 N.E.2d at 120.

In *Dionesotes*, the arresting officer testified that he did not subjectively suspect impairment, but suspected that something "unusual" was underway. Although the *Kelly* court in *dicta* criticized *Dionesotes* and sought to distinguish it on the grounds that the officer in *Dionesotes* had no subjective belief that defendant was specifically impaired, it is clear from the language of *Dionesotes* that the court did not consider driving that is merely "unsusual" enough to

provide the particularization necessary to initiate a *Terry* stop, regardless of the officer's lack of a subjective, particularized belief that a specific crime was being committed.

It should be further noted that courts are split on the issue of whether ·an officer's subjective belief is relevant in determining whether reasonable, articulable suspicion exists. Some courts have determined that an officer must have a subjective suspicion that is objectively reasonable in order to conduct a *Terry* stop, *see United States v. Lott*, 870 F.2d 778, 783-84(1st Cir. 1989), while others have determined that *Terry* is a purely objective test rendering an officer's subjective suspicions irrelevant. *United States v. Brown*, 188 F.3d 860, 866 (7th Cir. 1999); *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990). North Carolina has followed the line of cases holding that the officer's subjective suspicion is irrelevant and that the test is a purely objective one.. *Peck*, 305 N.C. at 741, 291 S.E.2d at 641-42 ("The officer's subjective opinion is not material. Nor are the courts bound by an officer's mistaken legal conclusion as to the existence or non-existence of probable cause or reasonable grounds for his actions. The search or seizure is valid when the objective facts known to the officer meet the standard required.").

Regardless of the officer's subjective suspicions or lack thereof in *Dionesotes*, it is apparent from the opinion that the court did not believe the totality of the circumstances, viewed objectively, gave rise to a reasonable suspicion of wrongdoing sufficient to justify a *Terry* stop. As cited above, the court determined that the facts "do not support a reasonable inference that defendant is committing, is about to commit, or has committed an offense." *Dionesotes*, 603 N.E.2d at 120. This language implicitly recognizes that even if the officer had subjectively suspected impairment, the facts known to him at the time would not have supported an investigative stop.

The *Dionesotes* court further stated, "[U]nusual behavior alone does not necessarily support a reasonable suspicion that a crime has occurred, is occurring or is about to occur. Without more, a proper basis to make a *Terry* stop has not been established." *Id.* at 120-21. Despite *Kelly's* criticisms of *Dionesotes*, *Dionesotes* has never been overruled and remains good law in Illinois.

Although it is not binding precedent on this Court, *Dionesotes* demonstrates that other courts have required much more to justify an investigative stop of a vehicle than the majority does in the instant case. While I agree with the majority that a 30-second delay in the

face of a changing traffic light is unusual, I disagree that it provides sufficient particularized suspicion that a driver is impaired.

Accordingly, I believe the officer did not have reasonable, articulable suspicion to stop the defendant given that he had nothing more than an unparticularized hunch that defendant was committing a crime. Any other factor, such as unsteady driving, might tip the scales to favor a *Terry* stop. But the delay alone is not enough.

The majority's opinion determines that at some point in the 20 seconds between a 10-second delay and a 30-second delay, an unparticularized hunch ripens into a reasonable, particularized suspicion, leaving trial courts in the unfortunate position of having to guess at the exact location of that point. This will inevitably lead to uneven enforcement and require trial courts to engage in an *ad hoc* guessing game. Further, the majority's decision so weakens the reasons supporting the *Roberson* decision that today's decision effectively overrules *Roberson*.

Since I believe that there was no basis for Officer Maltby to stop defendant, I further believe the crack pipe seized from defendant's car and statements made as a result of the stop were fruit of the poisonous tree and should have been excluded at trial. *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441 (1963).

The more difficult question in this case is whether the second crack rock seized from defendant after he completed the controlled buy should have been suppressed as fruit of the poisonous tree. The second crack rock would not have been discovered but for the police officers' violation of defendant's constitutional rights. However, the United States Supreme Court has made it clear that application of the fruit of the poisonous tree doctrine does not rest on a but-for test.

> We need not hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Id.* at 487-88 (quotation marks and citation omitted). Here, the evidence seized was discovered as part of defendant's participation in a controlled buy. By promising to dispose of the original charges stem-

ming from the illegal stop in exchange for defendant's cooperation, the police secured defendant's participation in the controlled buy, thus exploiting the original violation of defendant's rights. However, the evidence subsequently seized related to a crime committed by defendant *during* the course of the controlled buy, an intervening act unrelated to the original arrest. As such, the evidence can be said to have been gained by "means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488, 9 L. Ed. at 455. The United States Supreme Court has previously held that evidence sufficiently attenuated from the primary taint may not be subject to suppression as fruit of the poisonous tree. *Nardone v. United States*, 308 U.S. 338, 84 L. Ed. 307 (1939).

"The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217, 4 L. Ed. 2d 1669, 1677 (1960). Thus, the purpose underlying the fruit of the poisonous tree doctrine, deterring police misconduct, would not be furthered by suppression of the evidence.

Accordingly, I would determine that the second crack rock was not fruit of the poisonous tree, but evidence of a subsequent crime, and that the defendant's commission of a separate and intervening crime while participating in the controlled buy sufficiently purged the taint of the original illegality. Nevertheless, the second crack rock would never have been discovered by police if not for defendant's participation in the controlled buy. Since I believe there was no justification for police to stop, detain, and search defendant, I conclude the search that produced the crack rock can only be justified as a consent search. So the question becomes whether defendant consented to a search of his person following the controlled buy, and if so, whether that consent was given voluntarily or coerced by police.

[T]he question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a "voluntary" consent—the legitimate need for such searches

**IN RE S.J.M.**

[184 N.C. App. 42 (2007)]

and the equally important requirement of assuring the absence of coercion.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 36 L. Ed. 2d 854, 862-63 (1973). "Merely because a defendant is under arrest when consent is given does not render the consent involuntary. . . . It is, however, a factor which must be considered, and places a greater burden upon the State to show voluntariness." *State v. Cobb*, 295 N.C. 1, 17-18, 243 S.E.2d 759, 769 (1978) (citations omitted).

The issues of defendant's consent and the voluntariness of that consent are issues of fact to be determined by the trial court. Since the trial court made no findings of fact with respect to these issues, this Court is unable to conduct a proper review. Thus, I would vacate the judgment and hold that the evidence deriving from the illegal stop should be suppressed. I would remand to the trial court for further proceedings consistent with this opinion to determine whether defendant voluntarily consented to the search of his person that turned up the crack rock from the controlled buy.