STATE OF NORTH CAROLINA v. KENNETH BARNARD

No. 347A07

(Filed 11 April 2008)

**Search and Seizure— traffic stop—thirty-second delay at green light—reasonable suspicion of driving while impaired**

Defendant's thirty-second delay at a green traffic light under the circumstances gave rise to a reasonable, articulable suspicion that defendant may have been driving while impaired; the stop of his vehicle was constitutional, and the evidence (a crack pipe) obtained as a result of the stop was properly admitted. It is irrelevant that part of the officer's motivation for stopping defendant may have been a perceived, though apparently nonexistent, statutory violation of impeding traffic.

Justice BRADY dissenting.

Justice HUDSON dissenting.

Justice TIMMONS-GOODSON joins in this dissenting opinion.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 184 N.C. App. 25, 645 S.E.2d 780 (2007), finding no error in a judgment entered 6 April 2005 by Judge James U. Downs in Superior Court, Buncombe County. Heard in the Supreme Court 13 February 2008.

*Roy Cooper, Attorney General, by Daniel S. Johnson, Special Deputy Attorney General, for the State.*

*Anne Bleyman for defendant-appellant.*

*The Avery, P.C., by Isaac T. Avery, III, for North Carolina Association of Police Attorneys, and Kimberly N. Overton for North Carolina Conference of District Attorneys, amici curiae.*

NEWBY, Justice.

In this case we determine whether defendant's constitutional rights were violated by the traffic stop that led to his convictions. Based on the totality of the circumstances here, defendant's thirty-second delay before proceeding through a green traffic light gave rise

to a reasonable, articulable suspicion that he may have been driving while impaired. Because the stop of defendant's vehicle was constitutional, we affirm the majority decision of the Court of Appeals that affirmed the trial court's denial of defendant's motion to suppress all evidence obtained as a result of the stop.

Around 12:15 a.m. on 2 December 2004, Officer Brett Maltby was on patrol in a high crime area of downtown Asheville where a number of bars are located. Officer Maltby's marked patrol car was stopped behind defendant's vehicle at a red traffic light. When the light turned green, defendant remained stopped for approximately thirty seconds before making a legal left turn. Officer Maltby initiated a stop of the vehicle.

When he approached defendant to ask for his driver's license and registration, Officer Maltby noticed that defendant was shaking and that his breathing was rapid. Officer Maltby also detected a slight odor of alcohol on defendant's breath. Defendant said he did not have his license with him and gave Officer Maltby a name and birth date that did not match information on the officer's computer. Officer Maltby returned and asked defendant to step out of the vehicle. At that point, he observed an open container of alcohol in defendant's vehicle. After Officer Maltby placed defendant in investigatory detention, defendant provided his correct name, and Officer Maltby determined that defendant's driver's license was suspended. Officer Dwight Arrowood arrived at the scene and recovered a crack pipe (later determined to contain cocaine residue) and associated paraphernalia from defendant's vehicle.

Defendant offered to make a controlled buy of narcotics from a person known as "One-Arm Willy" if Officer Maltby would void defendant's citations for possession of an open container, driving while license suspended, and possession of drug paraphernalia. Officer Maltby agreed he would void the citations if defendant made a controlled buy. Later that night defendant successfully purchased a crack rock from One-Arm Willy. However, upon defendant's return to the police station, Officer Maltby searched defendant and found a second rock of cocaine, which defendant had obtained as a "front" from One-Arm Willy.

Defendant was subsequently charged with two counts of possession of cocaine and two counts of having achieved habitual felon status. Before trial, defendant moved to suppress evidence seized as a result of the searches of his vehicle and his person, as well as the

STATE v. BARNARD

[362 N.C. 244 (2008)]

statements he made to the police. Defendant's motion to suppress was denied. A jury found defendant guilty of two counts of possession of cocaine, and defendant pled guilty to one count of having achieved habitual felon status. The remaining habitual felon status charge was dismissed.

A divided Court of Appeals panel found no error. The majority determined that the thirty-second delay after the traffic light turned green gave Officer Maltby a reasonable suspicion that defendant was driving while impaired. Therefore, the evidence obtained as a result of the stop was properly admitted. *State v. Barnard*, 184 N.C. App. 25, 30-31, 645 S.E.2d 780, 784 (2007).[1] The dissent argued that a thirty-second delay, standing alone, did not provide reasonable suspicion of driving while impaired. As a result, the dissent would have excluded the evidence obtained and statements made during the stop. *Id.* at ——, 645 S.E.2d at 789-90 (Calabria, J., dissenting). However, the dissent recommended a remand to determine whether defendant consented to the search that occurred following the controlled buy. *Id.* at ——, 645 S.E.2d at 790-91.

The question before this Court is whether the stop of defendant's vehicle was constitutional. The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. The North Carolina Constitution provides similar protection. N.C. Const. art. I, § 20. A traffic stop is a seizure "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396, 59 L. Ed. 2d 660, 667 (1979). Such stops have "been historically viewed under the investigatory detention framework first articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)." *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3rd Cir. 2006) (citation omitted). Despite some initial confusion following the United States Supreme Court's decision in *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996), courts have continued to hold that a traffic stop is constitutional if the officer has a "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v.*

---

1. The majority also affirmed the admission of defendant's statements to Officer Maltby. Although defendant made the statements before he was advised of his *Miranda* rights, the evidence showed the statements were volunteered and not the result of an interrogation. *Barnard*, 184 N.C. App. at 30-31, 645 S.E.2d at 784-85. The dissent did not address this *Miranda* issue. As such, defendant's arguments on this issue are not properly before this Court. *See, e.g., Steingress v. Steingress*, 350 N.C. 64, 67, 511 S.E.2d 298, 300 (1999) (citing *Clifford v. River Bend Plantation, Inc.*, 312 N.C. 460, 463, 323 S.E.2d 23, 25 (1984)).

*Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 675, 145 L. Ed. 2d 570, 576 (2000) (citing *Terry*, 392 U.S. at 30, 88 S. Ct. at 1884, 20 L. Ed. 2d at 911); *see Delfin-Colina*, 464 F.3d at 396-97.

Reasonable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow*, 528 U.S. at 123, 120 S. Ct. at 675-76, 145 L. Ed. 2d at 576 (citation omitted). Only " 'some minimal level of objective justification' " is required. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1, 10 (1989) (quoting *INS v. Delgado*, 466 U.S. 210, 217, 104 S. Ct. 1758, 1763, 80 L. Ed. 2d 247, 255 (1984)). This Court has determined that the reasonable suspicion standard requires that "[t]he stop . . . be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training." *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994) (citing *Terry*, 392 U.S. at 21-22, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906). Moreover, "[a] court must consider 'the totality of the circumstances—the whole picture' in determining whether a reasonable suspicion" exists. *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621, 629 (1981)).

Here, the trial court concluded that based on the totality of the circumstances "a reasonable articulable suspicion of wrongdoing on the part of the [d]efendant existed." This conclusion of law is supported by the trial court's finding of fact that, after the traffic light turned green, defendant's vehicle "remained stopped for some 30 seconds without any reasonable appearance of explanation for doing so." The trial court's conclusion of law is also supported by Officer Maltby's testimony showing that, based on his training and experience, he made a rational inference from the thirty-second delay that defendant might be impaired:

> Q  Based upon your training and experience, do you have an opinion as to whether or not that sort of delayed reaction could usually involve an impaired substance or driving while impaired?
>
> A  [Officer Maltby] Absolutely. Yes, sir.
>
> Q  Can you articulate that?
>
> A  People's reaction is slowed down. A red light turning green and hesitating for 30 seconds definitely would be an indicator of impairment.

**STATE v. BARNARD**

[362 N.C. 244 (2008)]

Because defendant's thirty-second delay at a green traffic light under these circumstances gave rise to a reasonable, articulable suspicion that defendant may have been driving while impaired, the stop of defendant's vehicle was constitutional and the evidence obtained as a result of the stop was properly admitted. It is irrelevant that part of Officer Maltby's motivation for stopping defendant may have been a perceived, though apparently non-existent, statutory violation of impeding traffic. The constitutionality of a traffic stop depends on the objective facts, not the officer's subjective motivation. *See Whren*, 517 U.S. at 811-13, 116 S. Ct. at 1773-74, 135 L. Ed. 2d at 96-98; *State v. McClendon*, 350 N.C. 630, 634-36, 517 S.E.2d 128, 131-32 (1999).

All other issues raised by defendant are not properly before this Court. The decision of the Court of Appeals is affirmed.

AFFIRMED.

BRADY, Justice, dissenting.

Defendant's thirty second delay at a traffic intersection after the light turned green did not violate any law and, standing alone, could not have raised a reasonable, articulable suspicion that defendant was engaged in criminal activity. Consequently, Officer Maltby's stop of defendant's vehicle for purportedly "impeding flow of traffic" was an unconstitutional seizure of defendant's person in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures. The trial court erred when it concluded otherwise.

By affirming the decision of a divided panel of the Court of Appeals below and holding that the stop of defendant's vehicle was constitutional, the majority has lowered the threshold of the Fourth Amendment's standard of reasonable, articulable suspicion to an unacceptable level, dangerously exposing the citizens of North Carolina to the potential for unreasonable and arbitrary police practices unchecked by our state's trial and appellate courts. Accordingly, I am compelled to respectfully dissent.

## ANALYSIS

### I. THE FOURTH AMENDMENT AND TRAFFIC STOPS

### A. The Foundational Importance of the Fourth Amendment

The Fourth Amendment to the United States Constitution was created in direct response to the abuses of general writs of assist-

ance, which gave "customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws." *Stanford v. Texas*, 379 U.S. 476, 481 (1965). The uproar against and denunciation of these general writs, and the abuses by the petty officers to whom they had been issued, were instrumental in giving birth to the "child Independence." *Boyd v. United States*, 116 U.S. 616, 625 (1886) (citations and internal quotation marks omitted). Yet, the roots of the Fourth Amendment "go far deeper," *Stanford*, 379 U.S. at 482, to include all the abuses of the British Crown that the citizens of the Empire had endured for centuries, "from the time of the Tudors, through the Star Chamber, the Long Parliament, the Restoration, and beyond," *id.*; *see also Marcus v. Search Warrant of Prop.*, 367 U.S. 717, 724-29 (1961); *Boyd*, 116 U.S. at 624-29. It is against this backdrop that the Court must determine whether an officer may constitutionally seize an individual because of a single act or omission which is not itself a violation of any law or regulation.

### B. *Terry v. Ohio*: the Reasonable, Articulable Suspicion Standard

In *State v. Watkins*, this Court said:

> The Fourth Amendment protects the "right of the people . . . against unreasonable searches and seizures." U.S. Const. amend. IV. It is applicable to the states through the Due Process Clause of the Fourteenth Amendment. It applies to seizures of the person, including brief investigatory detentions such as those involved in the stopping of a vehicle.

337 N.C. 437, 441, 446 S.E.2d 67, 69-70 (1994) (alteration in original) (citations omitted). The Supreme Court of the United States has held that a law enforcement officer may initiate a brief stop and frisk of an individual if there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* at 27 (citation omitted). Since *Terry*, the reasonable, articulable suspicion standard has been applied to brief investigatory traffic stops. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975); *Watkins*, 337 N.C. at 441, 443, 446 S.E.2d at 70-71.

The majority suggests there has been "confusion" following *Whren v. United States*, 517 U.S. 806 (1996), as to whether "a traffic stop" is constitutional if supported by reasonable, articulable suspicion. I cannot acknowledge such confusion, at least among the decisions of this Court issued after *Whren* was decided. However, the imprecise language employed by the majority opinion paints over the important and intuitive distinction between an *investigatory* traffic stop, to which the reasonable, articulable suspicion standard has been applied, and a traffic stop performed on the basis of a *"perceived* traffic violation," to which we recently applied the standard of probable cause in *State v. Ivey. See* 360 N.C. 562, 564, 633 S.E.2d 459, 461 (2006) (emphasis added).

## C. *United States v. Cortez*: the Totality of the Circumstances

When determining whether a law enforcement officer had the reasonable, articulable suspicion necessary to seize a defendant, "[a] court must consider 'the totality of the circumstances—the whole picture.' " *Watkins*, 337 N.C. at 441, 446 S.E.2d at 70 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Moreover, "an assessment of the whole picture . . . must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Cortez*, 449 U.S. at 418. Consistent with the totality of the circumstances approach, a court must ascertain whether all of the circumstances *taken together* amount to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989); *see also United States v. Arvizu*, 534 U.S. 266, 274 (2002) (stating that *Terry* precludes a "divide-and-conquer analysis" of reasonable suspicion).

## D. The Degree of Suspicion Mandated by the Fourth Amendment

For investigatory traffic stops conducted pursuant to *Terry*, the totality of the circumstances approach creates the possibility that multiple factors "quite consistent with innocent travel" can, when viewed together, "amount to reasonable suspicion." *See Sokolow*, 490 U.S. at 9 (citations omitted). Indeed, *Terry* and its progeny "accept[] the risk that officers may stop innocent people." *See Illinois v. Wardlow*, 528 U.S. 119, 126 (2000). Ultimately, then, the key determination is not the innocence of an individual's conduct, "but the *degree of suspicion* that attaches to particular types of noncriminal acts." *Sokolow*, 490 U.S. at 10 (emphasis added) (citation and internal quotation marks omitted).

As a consequence of the inherent risk that *Terry* stops will be conducted against innocent persons, appellate courts should take great care not to set the standard of reasonable, articulable suspicion so low that the Fourth Amendment is rendered meaningless. It is true that the .degree of suspicion required for *Terry* stops is "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less demanding than that for probable cause." *Id.* at 7 (citations omitted). On the other hand, the requisite degree of suspicion must be high enough "to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *See Brown v. Texas*, 443 U.S. 47, 51 (1979). Such would be the case if reasonable suspicion were to be founded upon an "inchoate and unparticularized suspicion or 'hunch' " and nothing more. *See Terry*, 392 U.S. at 27.

## II. FOURTH AMENDMENT JURISPRUDENCE APPLIED TO THE INSTANT CASE

### A. Due Deference to the Trial Court's Findings of Fact

As the majority notes, the trial court's relevant findings of fact in its order denying defendant's motion to suppress were limited to the following statement: "[Defendant] remained stopped [at the green light] for some 30 seconds without any reasonable appearance of explanation for doing so, and the officer observed that the victim [sic] was impeding traffic, if nothing else."[2] It is well established that the appellate courts of this State are bound by a trial court's findings of fact on appeal if supported by competent evidence, and our determination is limited to "whether the trial court's findings of fact support its conclusions of law." *State v. Cheek*, 351 N.C. 48, 63, 520 S.E.2d 545, 554 (1999) (citing *Watkins*, 337 N.C. at 438, 446 S.E.2d at 68), *cert. denied*, 530 U.S. 1245 (2000). Appellate courts are simply not in a position to make findings of fact on the basis of a cold reading of the transcript and trial record.

To the extent the majority reaches beyond the trial court's findings of fact and relies substantially upon the testimony of Officer Maltby to buttress the trial court's conclusion of law, this action constitutes a usurpation of the trial court's preeminence as finder of fact

---

2. It is apropos, perhaps, that even the trial court referred to defendant as "the victim" when describing the unconstitutional seizure of defendant in making its findings of fact.

STATE v. BARNARD

[362 N.C. 244 (2008)]

and is contrary to this Court's settled precedent set forth in *Cheek*.[3] This overreach is especially troublesome considering that the testimony quoted in the majority opinion was provided by Officer Maltby in response to a *leading question* from the prosecutor. In fact, the only *unprompted* reasoning given by Officer Maltby for stopping defendant's vehicle was that defendant was "impeding flow of traffic," which Officer Maltby mistakenly believed to be a traffic violation, and that defendant's thirty second delay would typically mean "that the Defendant was paying particular attention to the rear view mirror and noticing me and not the actual traffic light," which is an *innocent* explanation for the officer's observations.[4]

### B. A Perpetuated Mistake of Law: "Impeding Traffic"

The State has conceded on appeal that the North Carolina motor vehicle safety regulations, codified in Chapter 20 of the North Carolina General Statutes, do not prohibit "impeding traffic." To the contrary, the statutory provision regulating motor vehicle movement at traffic signals provides: "When the traffic signal is emitting a steady green light, vehicles *may* proceed with due care through the intersection subject to the rights of pedestrians and other vehicles as may otherwise be provided by law." N.C.G.S. § 20-158(b)(2a) (2007) (emphasis added).

---

3. Apart from relying upon Officer Maltby's testimony that defendant's thirty second delay might have been consistent with impairment, the majority also asserts in its statement of the facts: "*Around 12:15 a.m.* on 2 December 2004, Officer Brett Maltby was on patrol in a *high crime area* of downtown Asheville where a number of bars are located." (Emphasis added.) However, neither the time at which the traffic stop occurred nor the characterization of the area in which it occurred as a "high crime area" comprised any part of the trial court's findings of fact. The majority has simply assumed the role of a trial court in order to "establish" these facts and cast defendant's thirty second delay in a more inculpatory light. Nevertheless, the majority is still left with only one factor to support its holding that the traffic stop was constitutional: defendant's thirty second delay.

4. The majority never contends, as indeed it cannot, that Officer Maltby *subjectively* believed defendant was driving while impaired at any time before he stopped defendant's vehicle. As reflected in his testimony under cross-examination, Officer Maltby never sounded his horn to alert defendant of the traffic signal turning green because he "wanted to further [his] investigation and watch [defendant] in his—in his driving demeanor at that point." However, under direct examination, Officer Maltby testified that he stopped defendant's vehicle "as he was turning." Thus, at no point does it appear that Officer Maltby actually attempted to observe defendant's driving demeanor for further signs of defendant's impairment, which clearly indicates that impairment played no part in Officer Maltby's on-the-spot decision to stop defendant's vehicle.

**STATE v. BARNARD**

[362 N.C. 244 (2008)]

It is readily apparent that Officer Maltby's decision to stop defendant's vehicle was made under the misapprehension that "impeding traffic" constitutes a violation of North Carolina's motor vehicle safety regulations. This conclusion follows from the officer's response on cross-examination regarding whether defendant's left turn into the intersection of Coxe Avenue and Hilliard Avenue constituted a "legal turn": "The stop at a green light was impeding flow of traffic, yes, ma'am."

The characterization of "impeding traffic" as a punishable offense also occurred during the hearing on defendant's motion to suppress when the prosecutor, who evidently lacked a clear understanding of the law, argued:

> [PROSECUTOR:] *There's a crime of impeding traffic.* [Defendant] did impede traffic, the officer's vehicle, was impeding traffic. The officer had a right to stop him, *had probable cause* to believe he's—that he was impeding traffic. I would ask Your Honor to deny the Defendant's motion in that regard.

(Emphasis added.) Finally, the trial court perpetuated this mistake of law in its order denying defendant's motion to suppress the evidence resulting from the traffic stop. The court's finding of fact was that defendant "remained stopped [at the green light] for some 30 seconds without any reasonable appearance of explanation for doing so, *and the officer observed that the [defendant] was impeding traffic, if nothing else.*" (Emphasis added.) Based solely upon this finding of fact, the court made its conclusion of law "that from the totality of the circumstances that a reasonable articulable suspicion of wrongdoing on the part of the Defendant existed to warrant Officer Maltby's stop of the Defendant's vehicle in view of its prolonged existence at this intersection without any reason for doing so."

The majority would have us believe that this mistake of law is wholly "irrelevant," citing *Whren,* 517 U.S. at 811-13, and *State v. McClendon,* 350 N.C. 630, 634-35, 517 S.E.2d 128, 131-32 (1999), for the proposition that courts are generally more concerned with the "objective facts" of a case than with an officer's "subjective motivation." While it is true that "[i]n examining the legality of a traffic stop, the proper inquiry is not the subjective reasoning of the officer, but whether the objective facts support a finding" that the stop was constitutional, *see Ivey,* 360 N.C. at 564, 633 S.E.2d at 460-61 (citing *McClendon,* 350 N.C. at 635, 517 S.E.2d at 132), neither of the two decisions relied upon by the majority for this assertion involved a mistake of law.

Indeed, since *Whren* was decided, federal circuit courts have widely held that a law enforcement officer's mistake of law concerning whether a traffic violation has occurred—as opposed to a mistake of fact—will generally render a stop unconstitutional. *See, e.g., United States v. Chanthasouxat*, 342 F.3d 1271, 1276-79 (11th Cir. 2003) (holding unconstitutional a traffic stop that was based upon the defendant's failure to have a rearview mirror affixed to the inside of his vehicle, which was not a requirement under city ordinance or Alabama law); *United States v. Lopez-Soto*, 205 F.3d 1101, 1105-06 (9th Cir. 2000) (holding unconstitutional a traffic stop that was based upon the defendant's failure to affix a registration sticker so that it was visible from the rear of his vehicle, which "simply was not a violation of Baja California law"); *United States v. Lopez-Valdez*, 178 F.3d 282, 289 (5th Cir. 1999) (holding a traffic stop unconstitutional because "no well-trained Texas police officer could reasonably believe that white light appearing with red light through a cracked red taillight lens constituted a violation of traffic law"); *United States v. Miller*, 146 F.3d 274, 276, 279 (5th Cir. 1998) (holding unconstitutional a traffic stop that was based upon the defendant's flashing his vehicle's turn signal without turning or changing lanes, which did not violate the Texas Transportation Code); *see also Ivey*, 360 N.C. at 566, 633 S.E.2d at 462 ("Because failure to give a signal, in and of itself, does not constitute a violation of N.C.G.S. § 20-154(a), nothing in the record suggests [the officer] had probable cause to believe any traffic violation occurred."). However, at least one federal circuit court has held that the constitutionality of the traffic stop might be based upon whether the defendant's actions gave rise to a reasonable, articulable suspicion that criminal activity was afoot, notwithstanding the officer's mistake of law. *See United States v. Delfin-Colina*, 464 F.3d 392, 400-01 (3d Cir. 2006) (citing generally *Whren*, 517 U.S. 806). *But see Lopez-Valdez*, 178 F.3d at 289 ("But if officers are allowed to stop vehicles based upon their subjective belief that traffic laws have been violated even where no such violation has, in fact, occurred, the potential for abuse of traffic infractions as pretext for effecting stops seems boundless and the costs to privacy rights excessive.").

## C. Defendant's Thirty Second Delay at the Traffic Signal

Even if this Court were to apply the reasonable, articulable suspicion standard despite the mistake of law committed by Officer Maltby and perpetuated by the prosecutor and the trial court, defendant's thirty second delay at the traffic signal after the light changed to

green, *standing alone*, is woefully inadequate to support a conclusion that the stop of defendant's vehicle was constitutional. The majority's application of the totality of the circumstances test underscores this stark reality: defendant's thirty second delay *is* "the totality of the circumstances—the whole picture" in the instant case. *See Watkins*, 337 N.C. at 441, 446 S.E.2d at 70 (quoting *Cortez*, 449 U.S. at 417 (internal quotation marks omitted)). The thirty second delay is the *sole factor* relied upon by the majority in its holding that defendant's conduct could have given rise to a reasonable, articulable suspicion that he was operating his vehicle under the influence of an impairing substance in violation of N.C.G.S. § 20-138.1(a).[5]

It is unprecedented for a court to hold, as the majority does, that a single act or omission that does not constitute a punishable offense and is therefore, by definition, subject to a myriad of innocent explanations, can nevertheless give rise to a reasonable, articulable suspicion that criminal activity is afoot. The Fourth Amendment demands something more. When *Terry* was decided in 1968, the Supreme Court of the United States established a basic pattern of analysis to be employed when courts apply the reasonable, articulable suspicion standard: Even though the factors presented in a case, when analyzed separately, might lend themselves to an innocent explanation, the determination which must be made is whether, *when taken together*, these otherwise innocent factors raise a reasonable, articulable suspicion of criminal activity. As stated in *Terry*:

> It was this legitimate investigative function Officer McFadden was discharging when he decided to approach petitioner and his companions. He had observed Terry, Chilton, and Katz go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation. There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the

---

5. Apart from the lack of precedent to support such a holding, there are two additional problems with the majority's reliance upon the *particular* suspicion that defendant was "driving while impaired," as have been noted above: First, there is no indication from the record that a suspicion of "driving while impaired" had anything to do with Officer Maltby's actual reasons for stopping defendant's vehicle. Second, the trial court made no finding of fact that defendant's conduct would have indicated he was impaired, but merely found that "defendant remained stopped for some 30 seconds without any reasonable appearance of explanation for doing so." Thus, the majority has usurped the trial court's role as finder of fact in order to establish the connection between a thirty second delay at an intersection and impaired driving.

street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away.

392 U.S. at 22-23. The same basic pattern of analysis was repeated by our nation's highest court more recently. *See Arvizu*, 534 U.S. at 277-78 ("Undoubtedly, each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others. Taken together, we believe they sufficed to form a particularized and objective basis for [the officer's] stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment."); *Sokolow*, 490 U.S. at 9 ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion." (citations omitted)).

By departing from this basic, well-established pattern of analysis, the majority has drastically lowered the bar for the degree of suspicion required when applying the reasonable, articulable suspicion standard. The majority begins with a single innocent factor and concludes that it gives rise to a reasonable, articulable suspicion of criminal activity. However, at no point does the majority attempt to combine this factor with others to reach the requisite degree of suspicion. The reason is *there were no additional factors to consider.*

As a consequence of the majority's holding, one factor "susceptible of innocent explanation," *see Arvizu*, 534 U.S. at 277, can raise a sufficient level of suspicion for an investigatory traffic stop to pass constitutional muster, so long as that factor is also susceptible of a *less*-than-innocent explanation. Single instances of conduct which the people of the Old North State have always considered well within the boundaries set by our criminal statutes will now subject all North Carolinians, innocent and guilty alike, to limitless searches or seizures by law enforcement personnel without the protection of any meaningful judicial oversight.

## STATE v. BARNARD

[362 N.C. 244 (2008)]

Even more disturbing is the utter lack of evidence in the record, much less contained in the trial court's findings of fact, that defendant's thirty second delay is *even rationally related* to a suspicion that he was operating his vehicle under the influence of an impairing substance. The lone exception is Officer Maltby's testimony, provided at the prosecutor's prompting, that this conduct might be consistent with impairment. The majority must be operating under the assumption that this rational relationship is patently obvious, as the majority provides no rationale to support its conclusion that a thirty second delay could even indicate the *possibility* of a defendant's impairment, apart from quoting the testimony of Officer Maltby, who it seems certain had not considered this possibility at the time he stopped defendant's vehicle.

In its brief and at oral argument, the State sought to have this Court consider the National Highway Traffic Safety Administration guide to the visual detection of motorists who are driving while under the influence of an impairing substance. Although this source was included in the appendix to the State's brief before this Court, it was not made a part of the record at trial and ought not to play a role in this Court's appellate review. Nonetheless, that portion of the copied text which was underlined by the State in its appendix is entirely unpersuasive: "A driver whose vigilance has been impaired by alcohol also might respond *more slowly than normal* to a change in a traffic signal." (Emphasis added). Again, the State has established no rational relationship between impaired driving and such a *lengthy* delay of thirty seconds.[6]

The State also contends that the greater weight of authority from other states with regard to delayed reactions to traffic signals turning green tends to support the Court of Appeals' majority opinion in the instant case and to undermine that court's earlier decision in *State v. Roberson. See* 163 N.C. App. 129, 134-35, 592 S.E.2d 733, 736-37, *disc. rev. denied*, 358 N.C. 240, 594 S.E.2d 199 (2004) (holding that the defendant's eight-to-ten second delay did not give rise to reasonable, articulable suspicion). One case cited by the State, *State v. Liberda*, 2002 Minn. App. LEXIS 1216 (Minn. Ct. App. Oct. 22, 2002), is an *unpublished* decision of the Minnesota Court of Appeals and should

---

6. Likewise, the facts of the instant case are not probative of this connection between a thirty second delay and impaired driving, since upon stopping defendant's vehicle, Officer Maltby almost immediately ascertained that defendant was not, in fact, impaired. Thus, there was by necessity some other explanation for defendant's conduct *besides* impairment.

STATE v. BARNARD

[362 N.C. 244 (2008)]

not be considered persuasive authority, as it serves no precedential value for Minnesota courts. *See* Minn. Stat. Ann. § 480A.08 subdiv. 3(c) (West 2002). Another case cited by the State, and also relied upon by the majority of the Court of Appeals, is inapplicable in this case because the holding was based upon the violation of a *perceived* motor vehicle safety regulation, meaning a probable cause standard should be applied. *See People v. Kelly*, 344 Ill. App. 3d 1058, 802 N.E.2d 850 (2003). In fact, the majority of cases from other states tend to undermine the State's contention that a delayed reaction to a traffic signal turning green, without more, can give rise to reasonable, articulable suspicion. *See, e.g., State v. Emory*, 119 Idaho 661, 664, 809 P.2d 522, 523, 525 (Ct. App. 1991) (holding that a five-to-six second delay at a green traffic light, coupled with defendant's proceeding to drive straight but very close to a long line of parked cars on a narrow street, failed to give rise to reasonable suspicion and "could just as easily be explained as conduct falling within the broad range of what can be described as normal driving behavior"); *People v. Dionesotes*, 235 Ill. App. 3d 967, 968-70, 603 N.E.2d 118, 119-20 (1992) (holding that a ninety second stop in the middle of the road for no apparent reason did not give rise to reasonable suspicion); *Minnetonka v. Shepherd*, 420 N.W.2d 887, 891 n.2 (Minn. 1988) (commenting that being stopped in the middle of a residential street for no apparent reason was "arguably not enough by itself to justify the stop" of the subject vehicle); *State v. Hjelmstad*, 535 N.W.2d 663, 666 (Minn. Ct. App. 1995) (noting that a four second delay, "without more, does not demonstrate erratic driving"); *State v. Cryan*, 320 N.J. Super. 325, 331-32, 727 A.2d 93, 96 (App. Div. 1999) (holding that a five second delay at a green traffic light, followed by an unusually slow left turn, would not have supported a finding of reasonable suspicion). *But see, e.g., State v. Puls*, 13 Neb. App. 230, 235, 690 N.W.2d 423, 428 (2004) (holding that a three-to-seven second delay at a green traffic light, by itself, "could promote a reasonable suspicion that [the defendant] was operating her [vehicle] under the influence of alcohol or drugs").

Defendant's thirty second delay was entirely consistent with any number of innocent explanations, such as changing a radio station, consulting a map for directions, indecision as to which direction one wishes to travel, placing or receiving a call on a cellular phone, or even, *as Officer Maltby himself testified*, a natural nervous reaction to observing an approaching law enforcement vehicle in the rearview mirror. In fact, a delay of thirty seconds is arguably *more* consistent with any of these innocent explanations than a delayed reaction of

only a few seconds, which itself could be indicative of the slowed reaction time one might expect to result from impairment.

Although "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct," *see Arvizu*, 534 U.S. at 277 (citation omitted), a determination that reasonable, articulable suspicion does *not* exist must be made by an appellate court when faced with a single, isolated factor that is susceptible to innocent explanation. To hold otherwise would be to permit law enforcement officers to act upon a mere "inchoate and unparticularized suspicion or 'hunch' " and would expose law-abiding citizens to searches or seizures at the slightest whiff of suspicion. *See Terry*, 392 U.S. at 27.

## CONCLUSION

Justice Thurgood Marshall gave us a stark reminder in his dissenting opinion in *Sokolow*: "Because the strongest advocates of Fourth Amendment rights are frequently criminals, it is easy to forget that our interpretations of such rights apply to the innocent and the guilty alike." 490 U.S. at 11 (Marshall & Brennan, JJ., dissenting) (citation omitted); *see also Brignoni-Ponce*, 422 U.S. at 889 (Douglas, J., concurring) ("In criminal cases we see those for whom the initial intrusion led to the discovery of some wrongdoing. But the nature of the test permits the police to interfere as well with a multitude of law-abiding citizens, whose only transgression may be a nonconformist appearance or attitude.").

Lest the American people, and the people of North Carolina in particular, forget the foundational importance of the Fourth Amendment right to be secure against unreasonable searches and seizures, we should recall that the cherished liberties enjoyed in our brief historical moment have been inherited by this generation only because they have been nurtured and protected by earlier generations of Americans so driven in their pursuit of liberty that life itself was not too great a cost to purchase liberty for themselves and their posterity. If the Framers of the first ten amendments of the Federal Constitution thought it worthy to enshrine this liberty into the Bill of Rights, conscious as they were of the abuses they endured under British colonial rule, this Court should not be so quick to make a short sighted and imprudent decision to render it obsolete.

The Supreme Court of North Carolina now stands alone among the nation's courts of last resort in holding that a single factor susceptible of *innocent* explanation can give rise to a reasonable,

articulable suspicion that *criminal* activity is afoot. I would hold instead that the stop of defendant's vehicle was unconstitutional and would reverse the decision of the Court of Appeals and remand to that court for consideration of those issues not addressed in its initial opinion. For the multitude of reasons set forth above, I respectfully dissent.

HUDSON, Justice dissenting.

The officer here stopped defendant for "impeding traffic," because defendant delayed for thirty seconds after a traffic light had turned green before making a legal turn. These were the only reasons articulated for stopping defendant's vehicle, and I do not agree that these reasons, without more, provide a reasonable basis for the stop. Therefore, I respectfully dissent.

Before trial, defendant moved to suppress evidence seized from his vehicle and from his person when he was stopped in the early morning hours of 2 December 2004 and to suppress any in-custody statements in connection with the incident. Defendant contended that "he was illegally seized and detained by Officer Maltby . . . without reasonable and articulable suspicion of criminal wrongdoing or probable cause for his arrest." Therefore, he argued, the physical evidence and statements he made were all fruits of his illegal search and seizure. The trial court found as fact that defendant "remained stopped for some 30 seconds without any reasonable appearance of explanation for doing so, and the officer observed that the victim [sic] was impeding traffic, if nothing else." Based solely thereon, the court denied defendant's motion. Although Officer Maltby testified that in his opinion, based on his training and experience, the delay "definitely would be an indicator of impairment," the trial court did not find this to be a reason for the stop.

It is well established that an officer may make a brief, investigatory stop of a vehicle if there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906 (1968); *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994). "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909

(citation omitted). On review, we must evaluate the totality of the circumstances to determine whether the officer possessed the reasonable, articulable suspicion needed to justify the stop. *United States v. Cortez*, 449 U.S. 411, 417, 66 L. Ed. 2d 621, 629 (1981); *Watkins*, 337 N.C. at 441, 446 S.E.2d at 70.

The State argues that there are no controlling authorities and that defendant cites no cases dealing with a thirty second delayed reaction to a green light. After also noting that this Court is not bound by the decision in *State v. Roberson*, 163 N.C. App. 129, 592 S.E.2d 733, *disc. rev. denied*, 358 N.C. 240, 594 S.E.2d 199 (2004), in which an eight to ten second delay was held not to justify a stop, the State also distinguishes *Roberson* on the basis that a thirty second delay cannot be explained as reasonable. However, in conducting its reasonable suspicion analysis, this Court does not review the thirty second delay in isolation, but rather, views the delay as part of the totality of the circumstances.

Here, in addition to the basis noted by the trial court, the circumstances included that the officer had followed defendant and observed no problems with his driving and that after the delay at the stoplight, defendant made a legal turn. Further, defendant contends that the sheer presence of a police cruiser immediately behind a vehicle can distract even law abiding citizens and that the officer's own testimony supports this reasonable, innocent explanation for the delay at the stoplight. The officer testified that the delay could have been due to the fact that "Defendant was paying particular attention to the rear view mirror and noticing [the officer] and not the actual traffic light."

It appears that the officer and the trial court here mistakenly believed that impeding the flow of traffic was a violation of the law which justified the stop and that the trial court rested its denial of defendant's motion to suppress solely on this mistaken belief and the thirty second delay. Because impeding the flow of traffic is not a violation of law and because the thirty second delay is easily explained as innocent, I do not agree that under the totality of these circumstances, the officer here had reasonable suspicion to stop defendant's vehicle. Thus, I respectfully dissent.

Justice TIMMONS-GOODSON joins in this dissenting opinion.