STROUD, Judge.
 

 *771
 
 Timothy Terrell Crandell ("defendant") appeals from the trial court's judgments entered upon a plea agreement. Defendant argues that the
 
 *772
 
 trial court erred in denying his motion to suppress, because the police officer who stopped defendant's car lacked reasonable suspicion. Defendant also filed a petition for writ of certiorari. We deny defendant's petition and affirm the trial court's judgments.
 

 I. Background
 

 "Blazing Saddles" is a partially burned, abandoned building in Johnston County. It is not a residence or a business-at least not a business allowed by law-and is "known for one thing and that is selling drugs and dealing in stolen property." Around 3:00 p.m. on 17 September 2013, Deputy Clifton, a member of the Johnston County Sheriff's Aggressive Field Enforcement ("SAFE") team, observed defendant drive into the area adjacent to "Blazing Saddles." He also noticed that a metal cable, which served as a gate, was down, which in his experience indicated that "Blazing Saddles" was "open for business." About two minutes later, Deputy Clifton observed defendant drive away from "Blazing Saddles." Deputy Clifton then stopped defendant's car and found that defendant possessed some marijuana. During the stop, Deputy Clifton also noticed that defendant had a ring which matched the description of a ring which had recently been reported as stolen.
 

 The following day, the police arrived at defendant's house and asked to search defendant's car; defendant consented. The police found the stolen ring in defendant's car. During the search, a detective noticed a tub "with some miscellaneous items" in the yard. The detective returned the following day to arrest defendant and noticed that the tub contained "quite a few tools that ... [had not] been there the day before." The police discovered that these tools had recently been stolen from defendant's neighbor's shed. The police later discovered that defendant had repeatedly instructed his girlfriend to testify that she had not given the police consent to search his house.
 

 On 16 December 2013, a grand jury indicted defendant for attaining the status of a habitual felon.
 
 See
 
 N.C. Gen.Stat. § 14-7.1 (2011). On 5 May 2014, a grand jury indicted defendant for second-degree burglary, larceny after breaking or entering, felony possession of stolen goods, and common law obstruction of justice.
 
 See
 
 N.C. Gen.Stat. §§ 14-3(b), -51, -71.1., -72(b)(2) (2013). On 5 May 2014, a grand jury indicted defendant for breaking or entering, larceny after breaking or entering, and felony possession of stolen goods.
 
 See
 
 N.C. Gen.Stat. §§ 14-54(a), -71.1., -72(b)(2) (2013). On 21 July 2014, a grand jury indicted defendant for five counts of common law obstruction of justice.
 
 See
 
 N.C. Gen.Stat. § 14-3(b) (2013).
 

 *773
 
 On 2 April 2014, defendant moved to suppress evidence obtained as a result of Deputy Clifton's stop. At a suppression hearing on 4 September 2014, the trial court rendered its order denying defendant's motion to suppress, which was memorialized in a written order entered on 17 October 2014. On or about 22 September 2014, the State and defendant executed a plea agreement in which the State dismissed two counts of possession of stolen goods and one count of common law obstruction of justice and defendant pled guilty to the remaining charges pursuant to
 
 North Carolina v. Alford,
 

 400 U.S. 25
 
 ,
 
 91 S.Ct. 160
 
 ,
 
 27 L.Ed.2d 162
 
 (1970). In the plea
 
 *792
 
 agreement, defendant gave notice of his intent to appeal the trial court's denial of his motion to suppress. On or about 23 September 2014, after a plea hearing, the trial court convicted defendant of one count of second-degree burglary, two counts of larceny after breaking or entering, five counts of common law obstruction of justice, and one count of breaking or entering. The trial court adjudged defendant to be a habitual felon and sentenced him to 117 to 153 months of imprisonment. At the conclusion of the plea hearing, defendant gave oral notice of appeal in open court.
 

 II. Petition for Writ of Certiorari
 

 Defendant filed a petition for writ of certiorari "asking this Court to permit appellate review in the event the Court should conclude that the notice of appeal was defective."
 

 [I]n order to properly appeal the denial of a motion to suppress after a guilty plea, a defendant must take two steps: (1) he must, prior to finalization of the guilty plea, provide the trial court and the prosecutor with notice of his intent to appeal the motion to suppress order, and (2) he must timely and properly appeal from the final judgment.
 

 State v. Cottrell,
 

 234 N.C.App. 736
 
 , 739-40,
 
 760 S.E.2d 274
 
 , 277 (2014). In the plea agreement, defendant gave notice of his intent to appeal the trial court's denial of his motion to suppress. At the conclusion of the plea hearing, defendant gave oral notice of appeal in open court. Accordingly, we hold that defendant gave timely, proper notice of appeal.
 
 See
 
 id.
 

 We therefore review the merits of defendant's appeal and deny defendant's petition.
 

 III. Motion to Suppress
 

 Defendant's only argument on appeal is that the trial court erred in denying his motion to suppress, because Deputy Clifton lacked
 
 *774
 
 reasonable suspicion to stop defendant's car, in contravention of the Fourth Amendment of the U.S. Constitution and article I, section 20 of the North Carolina Constitution.
 
 See
 
 U.S. Const. amend. IV ; N.C. Const. art. I, § 20.
 

 A. Standard of Review
 

 The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law. However, when ... the trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal. Conclusions of law are reviewed de novo and are subject to full review. Under a
 
 de novo
 
 review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal.
 

 State v. Biber,
 

 365 N.C. 162
 
 , 167-68,
 
 712 S.E.2d 874
 
 , 878 (2011) (citations and quotation marks omitted).
 

 B. Findings of Fact
 

 Defendant argues that competent evidence does not support the trial court's Findings of Fact 2, 5, and 27 in its order denying his motion to suppress. Defendant challenges the underlined portion of Finding of Fact 2:
 

 2. Defendant was charged with Second Degree Burglary, Felony Breaking and or Entering, 2 counts of Felony Larceny after Breaking and/or Entering, 2 counts of Felony Possession of Stolen Goods and Obstruction of Justice.
 
 The defendant also attained the status as a Habitual Felon and Habitual Breaking and/or Entering Offender.
 

 (Emphasis added.) Defendant contends that at the time of the suppression hearing, he had not yet attained the status of a habitual felon although he had been
 
 indicted
 
 for attaining the status of a habitual felon.
 
 See
 
 N.C. Gen.Stat. § 14-7.1. It is possible that some words were inadvertently omitted from this sentence, since it appears that in this paragraph the trial court was listing the offenses with which defendant had been charged. But in any event, we need not address this issue as it has no bearing on the issue of whether the trial court erred in denying his motion to suppress.
 

 *775
 
 Defendant next challenges Finding of Fact 5, which states:
 

 *793
 
 5. Deputy Clifton and other officers on the Safe Team routinely share information regarding these high crime areas, including the area referred to as "Blazing Saddles[,"] to stay informed of what type of criminal activity is going on throughout high crime areas.
 

 Defendant contends that "[t]here is no evidence to support a finding that this sharing occurred
 
 prior
 
 to [his] arrest." (Emphasis added.) We note that this finding of fact does not state that the sharing occurred prior to defendant's stop, but we agree with defendant that if Deputy Clifton had never heard of "Blazing Saddles" before and had no knowledge either directly or by reputation of its "business," he may have had far less basis for a suspicion of criminal activity. But there is abundant evidence that Deputy Clifton was quite familiar with "Blazing Saddles," both from personal experience and from the sharing of information with other officers, well before he ever saw defendant there. Deputy Clifton gave the following testimony:
 

 [The Court:] So since the date of this incident, how many times have you been out there?
 

 [Deputy Clifton:] Since the day-about 15 or so-
 

 [The Court:] Okay.
 

 [Deputy Clifton:] -or more charges since then.
 

 [The Court:] Okay.
 

 [Deputy Clifton:] And that's just me personally. [There have] been other officers that have made drug charges, been search warrants executed at this location.
 

 [The Court:] These other officers are part of the S.A.F.E. Team?
 

 [Deputy Clifton]: S.A.F.E. Team and our narcotics division.
 

 [The Court:] So,
 
 generally
 
 when they make arrests out there, do they come back and brief the rest of the S.A.F.E. Team with regard to the activity there?
 

 [Deputy Clifton:] Yes. The information is
 
 constantly
 
 passed back and forth between them and us.
 

 *776
 
 (Emphasis added.) Although Deputy Clifton testified to the sharing of information among SAFE team members after he had mentioned the number of stops he had made since defendant's stop, nothing in his testimony suggests that this sharing of information did not take place before defendant's stop. In addition, Deputy Clifton further testified that
 
 before
 
 defendant's stop, from January 2011 to 17 September 2013, the date of defendant's stop, he had made 23 stops in connection with activity at "Blazing Saddles" which led to drug-related charges. It is clear from his testimony generally and from other uncontested findings of fact that he was quite familiar with "Blazing Saddles" before he observed defendant there. Deputy Clifton testified: "This particular place,
 
 ever since I have been at the sheriff's office,
 
 has been known for one thing and that is selling drugs and dealing in stolen property." (Emphasis added.) We hold that this evidence is competent to support Finding of Fact 5 that Deputy Clifton and other police officers on the SAFE team "routinely share information" about criminal activity at "Blazing Saddles," as well as any implication that this "routine[ ]" sharing of information had occurred both before and after defendant's stop.
 
 See
 

 Biber,
 

 365 N.C. at 167-68
 
 ,
 
 712 S.E.2d at 878
 
 .
 

 Defendant also challenges Finding of Fact 27, which states:
 

 27. Based upon the location, the time of day, the amount of time Defendant was on the premises and his training and experience, Deputy Clifton, through his testimony, articulated specific facts that gave rise to his suspicion that criminal activity was afoot.
 

 Defendant "does not challenge this statement to the extent that the trial court found that Deputy Clifton articulated some facts which gave rise to his suspicion that
 
 some
 
 criminal activity was afoot." (Emphasis added.) Rather, he argues that these facts were insufficient to constitute reasonable suspicion that defendant, in particular, was engaged in criminal activity. Because defendant's argument is more properly characterized as a challenge to the trial court's conclusion of law that Deputy Clifton had reasonable suspicion to stop defendant's car, we address this argument below.
 

 *794
 
 C. Conclusion of Law
 

 Defendant argues that the findings of fact do not support the trial court's conclusion of law that Deputy Clifton had reasonable suspicion to stop defendant's car.
 

 The Fourth Amendment protects individuals against unreasonable searches and seizures. The North Carolina
 
 *777
 
 Constitution provides similar protection. A traffic stop is a seizure even though the purpose of the stop is limited and the resulting detention quite brief. Such stops have been historically viewed under the investigatory detention framework first articulated in
 
 Terry v. Ohio,
 

 392 U.S. 1
 
 ,
 
 88 S.Ct. 1868
 
 ,
 
 20 L.Ed.2d 889
 
 (1968). Despite some initial confusion following the United States Supreme Court's decision in
 
 Whren v. United States,
 

 517 U.S. 806
 
 ,
 
 116 S.Ct. 1769
 
 ,
 
 135 L.Ed.2d 89
 
 (1996), courts have continued to hold that a traffic stop is constitutional if the officer has a reasonable articulable suspicion that criminal activity is afoot.
 

 Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. Only some minimal level of objective justification is required.
 
 This Court has determined that the reasonable suspicion standard requires that the stop be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training. Moreover, a court must consider the totality of the circumstances-the whole picture in determining whether a reasonable suspicion exists.
 

 State v. Barnard,
 

 362 N.C. 244
 
 , 246-47,
 
 658 S.E.2d 643
 
 , 645 (emphasis added and citations, quotation marks, brackets, and ellipsis omitted),
 
 cert. denied,
 

 555 U.S. 914
 
 ,
 
 129 S.Ct. 264
 
 ,
 
 172 L.Ed.2d 198
 
 (2008).
 

 The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible.
 
 First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions-inferences and deductions that might well elude an untrained person.
 

 The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities
 
 *778
 
 was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same-and so are law enforcement officers.
 
 Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
 

 The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in
 
 Terry v. Ohio,
 
 ... said that, "this demand for specificity in the information upon which police action is predicated is
 
 the central teaching of this Court's Fourth Amendment jurisprudence.
 
 " [
 
 See
 

 Terry,
 

 392 U.S. at
 
 21 n. 18,
 
 88 S.Ct. at
 
 1879 n. 18,
 
 20 L.Ed.2d at
 
 906 n. 18 ] (emphasis added).
 

 United States v. Cortez,
 

 449 U.S. 411
 
 , 418,
 
 101 S.Ct. 690
 
 , 695,
 
 66 L.Ed.2d 621
 
 , 629 (1981) (emphasis added and brackets omitted).
 

 In
 
 Barnard,
 
 around 12:15 a.m. "in a high crime area of downtown Asheville where a number of bars are located[,]" a police officer stopped the defendant's vehicle after the defendant remained stopped at an intersection for approximately 30 seconds after the traffic light had turned green "without any reasonable appearance of explanation for doing so."
 
 Barnard,
 

 362 N.C. at 244, 247
 
 ,
 
 658 S.E.2d at 644-45
 
 . At a suppression hearing, the officer testified that the defendant's delayed reaction was an indicator of impairment.
 
 Id.
 
 at 247,
 
 658 S.E.2d at 645
 
 . Our Supreme Court held that "[b]ecause [the] defendant's thirty-second delay at a green traffic light under
 
 *795
 
 these circumstances gave rise to a reasonable, articulable suspicion that [the] defendant may have been driving while impaired, the stop of [the] defendant's vehicle was constitutional[.]"
 
 Id.
 
 at 248,
 
 658 S.E.2d at 645
 
 .
 

 Here, the trial court made the following findings of fact in support of its conclusion that Deputy Clifton had reasonable suspicion to stop defendant's car:
 

 3. [Deputy Clifton] has been a law enforcement officer since 1999, then moved from patrol to the narcotics division to sergeant of patrol, subsequently deployed by the military and since returning to the sheriff's office has
 
 *779
 
 been a member of the SAFE (Sheriff's Aggressive Field Enforcement) team.
 

 4. The SAFE team is responsible for responding to high crime areas where complaints have been made, and those areas of surveillance, where sometimes checkpoints and traffic stops are set up.
 

 5. Deputy Clifton and other officers on the Safe Team routinely share information regarding these high crime areas, including the area referred to as "Blazing Saddles[,"] to stay informed of what type of criminal activity is going on throughout high crime areas.
 

 6. "Blazing Saddles" consists of a piece of property that includes an abandoned building that is partially burned down, containing no electricity and where people frequent when dealing in drugs and/or stolen property.
 

 7. People often frequent the property at all hours, all the time.
 

 8. From the year 2011 to the date of this hearing Deputy Clifton had made a total of 37 arrests at this location.
 

 9. [Thirty-two] (32) of those arrests at this location were made during the day and the other 5 were made at night.
 

 10. [Twenty-three] (23) of those arrests were made prior to September 17, 2013 at [3:00 p.m.], when the arrest of the Defendant occurred.
 

 11. Deputy Clifton's other vehicle stops originating from this area were made as a result of his observation of motor vehicle violations and ultimately resulted in arrests for possession of narcotics.
 

 12. At the "Blazing Saddles[,"] there is a cable fence connected to the property.
 

 13. Deputy Clifton testified that his experience is that when the gate is down, the property is "open for business[,"] or it is the time period when people are selling or doing drugs on the property.
 

 14. On the date of this incident, the gate was down, indicating to Deputy Clifton that drug or other criminal activity may be occurring.
 

 *780
 
 15. On September 17, 2013, Deputy Clifton was on routine patrol.
 

 16. On September 17, 2013, Deputy Clifton observed Defendant turn into the premises of the "Blazing Saddles[,"] which is known to him and other officers, as a place where drugs are sold and where stolen items are possessed and sold as well.
 

 17. On September 17, 2013, there were at least 5 to 10 people already present at the "Blazing Saddles" location.
 

 18. Based upon Deputy Clifton's training, experience, conversations with drug suspects and arrestees and his own observations, the usual time period for a drug transaction occurs within approximately two minutes.
 

 19. Deputy Clifton had previously observed numerous drug transactions occurring at "Blazing Saddles" frequently for a period of time, lasting no more than five minutes.
 

 20. Deputy Clifton observed the defendant turn into the premises of the "Blazing Saddles" while [Deputy Clifton] proceeded down the road.
 

 21. Deputy Clifton then turned around, looped back, and then observed the Defendant exit the premises of the "Blazing Saddles."
 

 22. Deputy Clifton did not observe Defendant's activities at the "Blazing Saddles" but observed that the Defendant was on the premises of "Blazing Saddles" for approximately two minutes.
 

 23. Deputy Clifton testified that he didn't pull into the premises directly in his
 
 *796
 
 marked patrol car, because based upon experiences, perpetrators of drug crimes at "Blazing Saddles" flee when marked patrol cars enter the premises.
 

 24. Deputy Clifton further testified that Defendant's car turned [onto] the property and when [Deputy Clifton] saw the car exiting the property, based on [his] training and experience, the length of time was consistent with drug activity.
 

 *781
 
 25. After seeing the defendant enter the "Blazing Saddles" and then leave in a time frame consistent with a drug transaction, [Deputy Clifton] initiated an investigatory stop.
 

 On the date of the stop, based on his experience making 23 arrests in connection with drug activity at "Blazing Saddles" and other police officers' experiences at "Blazing Saddles," Deputy Clifton was aware of a steady pattern that people involved in drug transactions visit "Blazing Saddles" when the gate is down and stay only for approximately two minutes. Defendant followed this exact pattern: he visited "Blazing Saddles" when the gate was down and stayed approximately two minutes. Deputy Clifton's stop was "based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training."
 
 See
 

 id.
 
 at 247,
 
 658 S.E.2d at 645
 
 (citation omitted). Deputy Clifton had observed a "pattern[ ] of operation of [a] certain kind[ ] of lawbreaker[ ]" and "[f]rom these data" had drawn inferences and made deductions "that might well elude an untrained person."
 
 See
 

 Cortez,
 

 449 U.S. at 418
 
 ,
 
 101 S.Ct. at 695
 
 ,
 
 66 L.Ed.2d at 629
 
 . Accordingly, we hold that the totality of the circumstances gave rise to a reasonable, articulable suspicion that defendant was engaged in criminal activity.
 
 See
 

 Barnard,
 

 362 N.C. at 248
 
 ,
 
 658 S.E.2d at 645
 
 .
 

 Defendant also specifically challenges the trial court's Conclusion of Law 4, which states:
 

 4. This case is distinguishable both from [
 
 State v. Fleming,
 

 106 N.C.App. 165
 
 ,
 
 415 S.E.2d 782
 
 (1992) ] and from [
 
 Brown v. Texas,
 

 443 U.S. 47
 
 ,
 
 99 S.Ct. 2637
 
 ,
 
 61 L.Ed.2d 357
 
 (1979) ] because [Deputy Clifton] had specific knowledge of activity that was going on there because he had previously made arrests at the location for possession of narcotics and had been previously briefed by his colleagues regarding criminal activity being conducted at the location.
 

 We agree with the trial court that
 
 Brown
 
 and
 
 Fleming
 
 are distinguishable.
 

 In
 
 Brown,
 
 a police officer stopped the defendant after he and another police officer observed the defendant and another man "walking in opposite directions away from one another in an alley" in a neighborhood which "has a high incidence of drug traffic."
 
 Brown,
 

 443 U.S. at 48-49
 
 ,
 
 99 S.Ct. at 2639
 
 ,
 
 61 L.Ed.2d at 360
 
 . The police officer testified that "[a]lthough the two men were a few feet apart when they first were seen, ... both officers believed the two had been together or were about to meet until the patrol car appeared."
 

 Id.
 

 at 48
 
 ,
 
 99 S.Ct. at 2639
 
 ,
 
 61 L.Ed.2d at 360
 
 . The U.S. Supreme
 
 *782
 
 Court held that the police officer lacked reasonable suspicion to stop the defendant for the following reasons:
 

 [The police officer] testified at [the defendant's] trial that the situation in the alley "looked suspicious," but he was unable to point to any facts supporting that conclusion. There is no indication in the record that it was unusual for people to be in the alley. The fact that [the defendant] was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that [the defendant] himself was engaged in criminal conduct. In short, the [defendant's] activity was no different from the activity of other pedestrians in that neighborhood. When pressed, [the police officer] acknowledged that the only reason he stopped [the defendant] was to ascertain his identity.
 

 Id.
 

 at 52
 
 ,
 
 99 S.Ct. at 2641
 
 ,
 
 61 L.Ed.2d at 362-63
 
 (footnote omitted). The U.S. Supreme Court was careful to narrow its holding: "This situation is to be distinguished from the observations of a trained, experienced police officer who is able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained
 
 *797
 
 observer."
 

 Id.
 

 at 52 n. 2,
 
 99 S.Ct. at
 
 2641 n. 2,
 
 61 L.Ed.2d at
 
 362 n. 2.
 

 This Court in
 
 Fleming
 
 held that the facts in that case were analogous to the facts in
 
 Brown:
 

 [A]t the time [the police officer] first observed defendant and his companion, they were merely standing in an open area between two apartment buildings. At this point, they were just watching the group of officers standing on the street and talking. The officer observed no overt act by defendant at this time nor any contact between defendant and his companion. Next, the officer observed the two men
 
 walk
 
 between two buildings, out of the open area, toward Rugby Street and then begin
 
 walking
 
 down the public sidewalk in front of the apartments. These actions were not sufficient to create a reasonable suspicion that defendant was involved in criminal conduct, it being neither unusual nor suspicious that they chose to walk in a direction which led away from the group of officers. At this time, [the police officer] "stopped" defendant and his companion and immediately proceeded to ask them questions while he simultaneously "patted" them down.
 

 *783
 
 We find that the facts in this case are analogous to those found in
 
 Brown.
 
 [The police officer] had only a generalized suspicion that the defendant was engaged in criminal activity, based upon the time, place, and the officer's knowledge that defendant was unfamiliar to the area. Should these factors be found sufficient to justify the seizure of this defendant, such factors could obviously justify the seizure of innocent citizens unfamiliar to the observing officer, who, late at night, happen to be seen standing in an open area of a housing project or walking down a public sidewalk in a "high drug area." This would not be reasonable.
 

 Fleming,
 

 106 N.C.App. at 170-71
 
 ,
 
 415 S.E.2d at 785-86
 
 . Defendant argues that he, like the defendant in
 
 Fleming
 
 , made "no overt act" sufficient to create a reasonable suspicion.
 
 See
 

 id.
 
 at 170,
 
 415 S.E.2d at 785
 
 .
 

 But we distinguish this case from
 
 Brown
 
 and
 
 Fleming,
 
 because Deputy Clifton observed defendant follow a specific pattern that was closely consistent with his knowledge and experience of a certain kind of lawbreaker at this particular location: defendant visited "Blazing Saddles" when the gate was down and stayed only for approximately two minutes. In addition, this was not just a "high drug area"; it was a location with no use or purpose other than criminal activity.
 
 See
 

 id.
 
 at 171,
 
 415 S.E.2d at 785-86
 
 . "Blazing Saddles" was notorious for "selling drugs and dealing in stolen property." It was an abandoned, partially burned building with no electricity, and there was no apparent legal reason for anyone to go there at all, unlike the neighborhood in
 
 Brown
 
 or the apartment complex in
 
 Fleming,
 
 where people actually lived.
 
 See
 

 id.
 
 at 170-71,
 
 415 S.E.2d at
 
 785-86 ;
 
 Brown,
 

 443 U.S. at 52
 
 ,
 
 99 S.Ct. at 2641
 
 ,
 
 61 L.Ed.2d at 362-63
 
 . The U.S. Supreme Court in
 
 Brown
 
 was careful to distinguish the facts in that case from factual situations like the one present here: "This situation is to be distinguished from the observations of a trained, experienced police officer who is able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer."
 
 See
 

 Brown,
 

 443 U.S. at
 
 52 n. 2,
 
 99 S.Ct. at
 
 2641 n. 2,
 
 61 L.Ed.2d at
 
 362 n. 2. This case is much more comparable to
 
 Barnard,
 
 where our Supreme Court held that the "defendant's thirty-second delay at a green traffic light under [those] circumstances gave rise to a reasonable, articulable suspicion that [the] defendant may have been driving while impaired[.]"
 
 362 N.C. at 248
 
 ,
 
 658 S.E.2d at 645
 
 . Following
 
 Barnard,
 
 we hold that the trial court did not err in holding that Deputy Clifton had reasonable suspicion to stop defendant's vehicle and thus did not err in denying defendant's motion to suppress.
 
 See
 
 id.
 

 *784
 
 IV. Conclusion
 

 For the foregoing reasons, we affirm the trial court's judgments.
 

 AFFIRMED.
 

 Judges STEPHENS and DAVIS concur.